NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4999-12T2

GLENN HEDDEN

     Plaintiff-Respondent,

v.

KEAN UNIVERSITY, MATTHEW CARUSO
and PHILIP CONNELLY,

     Defendants-Appellants.

| APPROVED FOR PUBLICATION |
| :---: |
| **October 24, 2013** |
| **APPELLATE DIVISION** |

---

Argued September 23, 2013 - Decided October 24, 2013

Before Judges Parrillo, Harris and Guadagno.

On appeal from an Interlocutory Order of the
Superior Court of New Jersey, Law Division,
Union County, Docket No. L-2278-11.

Michael J. Dee argued the cause for
appellants (McElroy, Deutsch, Mulvaney &
Carpenter, LLP, attorneys; John J. Peirano,
of counsel; Mr. Dee and Melanie D.
Lipomanis, on the brief).

David F. Corrigan argued the cause for
respondent (The Corrigan Law Firm,
attorneys; Mr. Corrigan, of counsel; Mr.
Corrigan and Bradley D. Tishman, on the
brief).

The opinion of the court was delivered by

PARRILLO P.J.A.D.

We granted leave to appeal an interlocutory order of the Law Division compelling production of an e-mail sent by the head women's basketball coach at Kean University to the University's general counsel, that the University claims is protected by the attorney-client privilege. For reasons that follow, we reverse.

Briefly by way of background, plaintiff Glenn Hedden is the University's former athletic director. In that capacity, he supervised Michele Sharp, who was the head women's basketball coach at the University. Plaintiff was terminated on May 2, 2011, supposedly for failure to properly supervise subordinates in the athletic program, which in turn led to the University being sanctioned by the National Collegiate Athletic Association (NCAA) for violations of NCAA rules in connection with its women's basketball program. Plaintiff responded by filing a complaint against the University[1], alleging wrongful termination in violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14 (CEPA), for reporting those violations to the NCAA, and defamation.

The incident giving rise to the NCAA action concerned Sharp's efforts in 2010 to organize a summer trip to Spain for

---

[1] Also named in the complaint as defendants were Philip Connelly, the University's executive vice president of general operations, and Matthew Caruso, the University's director of media relations.

her basketball team. There was both an educational and athletic component to the tour, as the student-athletes would be developing their skills as basketball players as well as earning three credits in a Spanish history course. To defray the cost of the trip, Sharp drafted fundraising correspondence to potential donors, requesting their sponsorship. Before releasing it, however, on January 29, 2010, Sharp sent an e-mail with the fundraising letter attached to Michael Tripodi, the University's general counsel, requesting his review. Tripodi apparently responded orally to Sharp.

According to plaintiff, it was not until the Fall 2010, well after the team returned from Spain, that he first became aware of possible violations of NCAA regulations associated with the trip, particularly its funding and academic course aspects. After he conducted an internal investigation, plaintiff contacted the NCAA to report the violations uncovered.

Consequently, the NCAA launched its own confidential investigation, as a result of which the entity issued a Notice of Allegations to both Sharp and the University, requesting a response from each. Sharp retained her own attorney to represent her in the NCAA matter, and as part of her January 23, 2012 response, produced, through counsel, her January 29, 2010 e-mail to Tripodi, which is at the core of the controversy in

3                                                                              A-4999-12T2

this appeal.[2]  Although the University received a copy of Sharp's submission to the NCAA, it claims it was never consulted beforehand and did not authorize disclosure of the disputed e-mail.  Neither, however, did the University object to its release to the NCAA or assert any privilege attaching to the document, until, that is, the present litigation.

During discovery, plaintiff requested production of, among other things, the January 29, 2010 e-mail from Sharp to Tripodi. The University refused, asserting the e-mail was protected from disclosure by the attorney-client privilege because it was sent to counsel for the purpose of obtaining legal advice.  Plaintiff disagreed, contending the e-mail was not contained in a privilege log and, in any event, the privilege was waived by Sharp's disclosure of the e-mail to the NCAA without the University's objection.  The University countered that there was no waiver of the privilege because Sharp was not authorized by her employer — the actual holder of the privilege — to waive the privilege on its behalf.

Unable to resolve the matter, plaintiff moved to compel production of the disputed e-mail.  In granting the requested

---

[2] Sharp's response to the NCAA indicated that the e-mail may concern plaintiff's alleged refusal to discuss with her the Spanish course and financing for the term's trip to Europe.

A-4999-12T2

relief, after reviewing the e-mail in camera,[3] the motion judge found that defendant failed to prove Sharp's purpose in sending the e-mail was to obtain legal advice and that, in any event, as holder of the privilege, Sharp's submission of the e-mail to the NCAA constituted a waiver.

On their motion for reconsideration, defendants submitted the certification of Tripodi attesting to his understanding that the purpose of Sharp's e-mail was to obtain legal advice and, as a result, he rendered legal advice to Sharp. Tripodi further certified that "employees at the direction of those in the management ranks often come to me for the purpose of obtaining legal advice on various matters concerning the University[,]" and that he reviewed Sharp's letter to "ensure that external

---

[3] Concerning the disputed item, the motion judge commented:

> Here, both the e-mail and the attachment are relevant to the plaintiff's C.E.P.A. claim since the content of the e-mail corroborates, to some degree, the plaintiff's claim that Michele Sharp worked with several high level officials to arrange the trip without notifying the plaintiff. Plaintiff makes this allegation in ¶ 11 of his Complaint. In addition, upon reviewing the content of the attachment, which is a letter addressed to a blank recipient and is signed by Sharp, it is clear the letter was intended to be used to generate financial support or seek donations from recipients of the letter to help defray the cost of the trip for students on the basketball team.

communications sent by a University employee in his or her official capacity do not improperly purport to bind or commit the University to future conduct."

Accepting the Tripodi certification, the motion judge found that there was an attorney-client relationship between Sharp and Tripodi, but nevertheless reaffirmed her earlier ruling that the privilege had been waived upon Sharp's disclosure of the e-mail to the NCAA. Rejecting defendants' position that Sharp was not acting within the scope of her authority upon such disclosure, the motion judge reasoned:

> However, in this context the court finds that Sharp's disclosure to [the] N.C.A.A. waived the privilege because it appears from all the evidence provided to the court, that not only was Sharp's submission consistent with upper management's position regarding the allegations on the financial benefit, but [defendants'] failure to demonstrate the University's contrary position on this issue renders their argument specious. Additionally, [defendants] did not seek to prevent disclosure of the e-mail based on the privilege to the N.C.A.A. or take any action after it was disclosed to prevent any consideration of the material contained therein.

On appeal, defendants essentially argue, as they did below, that Sharp was not authorized by the University, as holder of the attorney-client privilege, to waive its protection. We agree.

We start with some basic principles that govern our disposition of the matter. First, we "normally defer to a trial court's disposition of discovery matters . . . unless the court has abused its discretion[,]" or the decision is based on "a mistaken understanding of the applicable law." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559 (1997). Because "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference[,]" Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995), we review the applicability of the attorney-client privilege, and its potential waiver in this case, de novo.

It is well-settled under New Jersey law that communications between lawyers and clients "in the course of that relationship and in professional confidence" are privileged and therefore protected from disclosure. N.J.S.A. 2A:84A-20(1); N.J.R.E. 504(1). Specifically, the attorney-client privilege generally applies to communications (1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made in confidence, (4) by the client. See Metasalts Corp. v. Weiss, 76 N.J. Super. 291, 297 (Ch. Div. 1962).

The attorney-client privilege "recognizes that sound legal advice or advocacy serves public ends and rests on the need to 'encourage full and frank communication between attorneys and their clients.'" United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 561 (App. Div. 1984) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584, 591 (1981)). "'Preserving the sanctity of confidentiality of a client's disclosures to his attorney [promotes] an open atmosphere of trust.'" United Jersey Bank, supra, 196 N.J. Super. at 561 (quoting Reardon v. Marlayne, 83 N.J. 460, 470 (1980)). Accordingly, "the confidentiality of communications between client and attorney constitutes an indispensable ingredient of our legal system." In re Grand Jury Subpoenas Duces Tecum, 241 N.J. Super. 18, 27-28 (App. Div. 1989).

The benefit of the attorney-client privilege extends to a corporation or other organization or association, "which must act through agents, including [its] officers and employees." United Jersey Bank, supra, 196 N.J. Super. at 562 (quoting Macey v. Rollins Envtl. Servs. (N.J.), 179 N.J. Super. 535, 540 (App. Div. 1981)); see also Payton, supra, 148 N.J. at 550; N.J.S.A. 2A:84A-20(3) (defining client as "a person or corporation . . . that, directly or through an authorized representative, consults a lawyer . . . for the purpose of . . . securing legal service

or advice from him in his professional capacity"); N.J.R.E. 504(3) (same).  The privilege, therefore, belongs to the institution and covers confidential communications between the entity's attorneys and its employees.  Upjohn, supra, 449 U.S. at 395, 101 S. Ct. at 685, 66 L. Ed. 2d at 594-95.

In Upjohn, supra, the Supreme Court held that communications made by mid or low-level employees within the scope of their employment to the corporation's attorney for the purposes of aiding counsel in providing legal advice were protected by attorney-client privilege.  449 U.S. at 391, 101 S. Ct. at 683, 66 L. Ed. 2d at 592.  Indeed, "[t]he necessity for full and open disclosure between corporate employees and in-house counsel . . . demands that all confidential communications be exempt from discovery."  Macey, supra, 179 N.J. Super. at 540.  This even includes an e-mail communication between attorney and client during the course of a professional relationship and in confidence.  Seacoast Builders Corp. v. Rutgers, 358 N.J. Super. 524, 553 (App. Div. 2003).

To be sure, while the attorney-client privilege is "clearly extremely important," it is neither absolute nor sacrosanct.  Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 504(3).  Because the privilege results in the suppression of evidence, it "is to be strictly limited to the purposes for

which it exists, _i.e._, the need for consultation between attorney and client without fear of public disclosure." State v. Humphreys, 89 N.J. Super. 322, 325 (App. Div. 1965). However, "[w]here the privilege is applicable, 'it must be given as broad a scope as its rationale requires.'" United Jersey Bank. supra, 196 N.J. Super. at 561 (quoting Eversun v. Bank of N.Y., 99 N.J. Super. 162, 168 (App. Div.), certif. denied, 51 N.J. 394 (1968)). And while the burden of proof is on the person or entity asserting the privilege to show its applicability in any given case, L.J. v. J.B., 150 N.J. Super. 373, 378 (App. Div.), certif. denied sub nom. Jacobsen v. Balle, 75 N.J. 24 (1977), there is a presumption that a communication made in the lawyer-client relationship has been made in professional confidence. N.J.R.E. 504(3); see also Hannan v. St. Joseph's Hosp. & Med. Ctr., 318 N.J. Super. 22, 28 (App. Div. 1999); State v. Schubert, 235 N.J. Super. 212, 220-21 (App. Div. 1989), certif. denied, 121 N.J. 597, cert. denied, 496 U.S. 911, 110 S. Ct. 2600, 110 L. Ed. 2d 280 (1990).

One of the key issues regarding the applicability of the privilege in this case is the purpose of Sharp's e-mail to Tripodi. If the purpose was to solicit legal advice, then the privilege applies. However, if Sharp's ultimate goal was to secure business advice or other non-legal services, then the

privilege does not apply.  See United States v. Rockwell, Int'l, 897 F.2d 1255, 1264 (3d Cir. 1990).

In this regard, we agree with the motion judge that as an employee of the University and acting within the scope of her employment, Sharp's purpose in sending the e-mail to Tripodi was to solicit his legal advice as University general counsel and, thus, an attorney-client relationship was formed.  It is undisputed that in the e-mail Sharp asks Tripodi to review a draft of a fundraising letter and there would be no plausible reason for the request other than to solicit legal advice from counsel since Tripodi had no other involvement in University fundraising activities.  In fact, in his capacity as general counsel and in the course of his employment, "it [was] not unusual for [Tripodi] to review documents relating to fundraising activities on behalf of the University" to ensure that those activities "[complied] with any applicable state and federal laws and regulations" and did not "improperly purport to bind or commit the University to future conduct."  And while there was no certification from Sharp attesting to her purpose in sending the e-mail, Tripodi well understood the nature of the inquiry because he reviewed the letter and later "conveyed [his] legal opinion regarding the letter."  Plaintiff's intimation to the contrary, that Sharp was seeking advice from Tripodi "merely

as a representative of Kean University" and not in his legal capacity, has no support in the record. The fact that Tripodi had no involvement in fundraising other than reviewing such solicitations to provide legal advice, and actually rendered such a service in this very instance, belies the naked suggestion that the e-mail was sent for some other, non-legal purpose. Clearly Sharp sent the e-mail to Tripodi because its contents could bind the University and the communication would not have been made but for Sharp's need for legal advice or services.

Equally clear is that as head women's basketball coach, Sharp was acting within the scope of her employment when soliciting legal advice from University counsel and, furthermore, that her communication to him was made in confidence. Confidential communications are those "communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended." State v. Schubert, supra, 235 N.J. Super. at 221. Furthermore, confidential communications may be disclosed to a non-client or non-party who shares the client's interest, without surrendering confidentiality. See In re State Comm'n of Investigation Subpoena No. 5441, 226 N.J. Super. 461, 466-67

(App. Div.), certif. denied, 113 N.J. 382 (1988). In this case, Sharp had a reasonable expectation of confidentiality since the document was sent internally to Tripodi, in his capacity as university counsel. Contrary to the dissent's view, the fact that another University employee may have been copied on the email does not defeat its confidential nature because as a fellow employee with an interest in the matter, he shared Sharp's interest in protecting the University from liability. See Mead Data Ctr., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977) (noting that communications circulated among more than one employee of the client can still be confidential as long as those employees are authorized to act for the corporation in relation to the subject matter of the communication); cf. Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 863-64 (D.C. Cir. 1980) (holding that distributing a memo widely within an agency defeated the privilege but noting that "[w]hen the client is by nature a group, as is true of . . . corporations, the courts have agreed that the privilege should not be defeated by some limited circulation beyond the attorney and the person within the group who requested the advice" and advising that if disclosure had been limited to personnel responsible for the matter at issue, "[the court] would have a different case."). See also Murphy v. Tenn. Valley

Auth., 571 F. Supp. 502, 506 (D.D.C. 1983) (holding that an employee's communications to general counsel requesting legal advice remained confidential even though they were distributed to other employees involved in the matter because "such limited dissemination does not amount to a breach of confidentiality in the corporate attorney-client context"); L.S.B. Indus., Inc. v. Comm'r, 556 F. Supp. 40, 44 (W.D. Okla. 1982) (holding that attorney-client privilege was not waived when a letter sent by an IRS regional counsel to the DOJ, requesting legal services, was copied to other IRS personnel involved in the investigation).

The closer question is whether the University waived the attorney-client privilege upon Sharp's disclosure of the e-mail to the NCAA. In this regard, N.J.S.A. 2A:84A-29 (N.J.R.E. 530) addresses waiver and provides in part:

> A person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.

The privilege, of course, can be waived only by the client and not the lawyer. Sicpa N. Am., Inc. v. Donaldson Enters., 179 N.J. Super. 56, 60-61 (Law Div. 1981).

Generally, once privileged material is disclosed, the privilege of non-disclosure is waived as to that matter. See <u>In re Grand Jury Subpoenas Issued</u>, 389 <u>N.J. Super.</u> 281, 298 (App. Div. 2006). Not all disclosures, however, amount to waivers. For example, an unauthorized disclosure by someone who is not the holder of the privilege does not generally constitute a waiver. <u>In re Grand Jury Subpoenas Duces Tecum</u>, <u>supra</u>, 241 <u>N.J. Super.</u> at 31; <u>In re Nackson</u>, 221 <u>N.J. Super.</u> 187, 191 (App. Div. 1987), <u>aff'd</u>, 114 <u>N.J.</u> 527 (1989).

Here, the motion judge found, without further explication, that "[f]rom the facts submitted as part of this motion it would appear that Sharp, as holder of the privilege, also had the capacity to waive the privilege." We disagree. In the organizational context, where the corporate employee communicates with corporate counsel on behalf of the entity, the corporation is the client. <u>Upjohn</u>, <u>supra</u>, 449 <u>U.S.</u> at 390, 101 <u>S. Ct.</u> at 683, 66 <u>L. Ed.</u> 2d at 591-92. Simply put, the authority to waive the attorney-client privilege does not belong to each and every employee of the corporation, but rather is held by the organizational client, namely the officers and directors of the organization. <u>Commodity Futures Trading Co. v. Weintraub</u>, 471 <u>U.S.</u> 343, 348, 105 <u>S. Ct.</u> 1986, 1991, 85 <u>L. Ed.</u> 2d 372, 378 (1985); <u>United States v. Doe</u>, 219 <u>F.</u>3d 175, 184-85

(2d Cir. 2000).  Thus, the group of individuals who may waive the privilege on behalf of the organizational client is restricted to those who manage or control its activities.

Sharp does not fit within this category as she was neither a director nor officer of the University, nor did she serve in a management capacity.  Moreover, Sharp was not acting under the direction of the University when she released the document to the NCAA, producing it through her own counsel on her own behalf, in response to an inquiry directed specifically to her by the NCAA.  Thus, as Sharp was not the holder of the attorney-client privilege, it was not hers to waive.

The motion judgment nevertheless found Sharp had implied authorization to disclose the e-mail because the University shared a common interest in its release and failed to object at the time of its production, amounting to a de facto waiver of the privilege.  We again disagree.

Obviously, since the attorney-client privilege can only apply to a corporation through the statements of its agents, conversely it can be waived by the agent but only if acting within the scope of her authority and official duties.  On this score, we emphasize that the University neither directed nor approved Sharp's release of the e-mail.  When she submitted the document to the NCAA, Sharp was not acting within the scope of

16

her employment or official duties, but rather in her own personal interest, through her own counsel. She did not seek prior authorization from the University and in fact failed to consult or notify her employer in advance of copying the University on her submission, presumably simultaneously with its filing. The fact that the University did not voice an objection at the time or take affirmative steps to reverse Sharp's unilateral action does not defeat assertion of the privilege by its true holder.

We have previously found that a disclosure of a privileged communication by another party was not authorized even when the client did not object to the disclosure at the time it occurred. In re Grand Jury Subpoena Duces Tecum, 241 N.J. Super. at 31; see also Stewart Equipment Co. v. Gallo, 32 N.J. Super. 15 (Law Div. 1954) (holding that a disclosure by a vice president and sales manager of a corporation did not constitute waiver because he did not seek authorization from the board of directors); Doe, supra, 219 F.3d at 189-90 (suggesting that disclosure by a low level employee testifying during a grand jury proceeding may not constitute waiver when that employee was appearing in his individual capacity, and it was not clear whether the waiver was intentional). Similarly here, under these circumstances, where Sharp was clearly not acting as the University's agent or with

17

its express authorization, we do not deem her disclosure to the NCAA to be a waiver under N.J.R.E. 530 and N.J.S.A. 2A:84A-29.

Lastly, the motion judge, assuming the existence of the privilege, seemed to imply that it should otherwise be pierced because plaintiff made a showing of need, relevance and materiality, and the fact that the information could not be secured from any less intrusive source, citing In re Kozlov, 79 N.J. 232, 243-44 (1979).[4] Kozlov's privilege-piercing analysis, however, has been severely curtailed and its general applicability discarded. See State v. Mauti, 208 N.J. 519, 537-39 (2012). Kozlov's three-part balancing test is now "restricted . . . to instances where constitutional rights are at stake, notably in the criminal law context." Biunno, Current N.J. Rules of Evidence, supra, comment 6 on N.J.R.E. 504. Here, there are no constitutional rights or overriding public policy or societal concerns to which the attorney-client privilege should yield. We therefore find the attorney-client privilege has not been waived in this instance and therefore exists to protect the disputed e-mail from disclosure.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] In In re Kozlov, supra, our Supreme Court defined the "necessary foundations to the valid piercing of [the attorney-client] privilege. . . ." There must be: (1) a legitimate need of the party to reach the evidence sought to be privileged; (2) a showing of relevance and materiality; and (3) the information cannot be secured from any less intrusive source. Id. at 243-44.

A-4999-12T2

**GUADAGNO, J.A.D., dissenting**

Because I believe the email in question was not sent by Michele Sharp for the purpose of seeking legal advice, I respectfully dissent from the conclusion reached by the majority that the email is protected by the attorney-client privilege. Moreover, any privilege that may have attached to the email was waived when Sharp submitted it to the NCAA without any objection from Kean University.

Some additional facts, not contained in the majority opinion, inform my decision. Glenn Hedden maintains that he first learned about the course entitled "History of Spain" on November 22, 2010, when a Kean mathematics professor informed him that a member of the women's basketball team was not taking a sufficient number of credits to maintain her eligibility.[1] Hedden checked the student's records and learned that her schedule contained an "added course" entitled "History of Spain." Further investigation by Hedden revealed that only nine students enrolled in the course and all were present or former members of the women's basketball team. Although the trip to Spain took place in late August 2010, the course offering did not appear on the University's registration system until

---

[1] Sharp maintains that she attempted to discuss the trip with Hedden but he failed to respond to her request for guidance.

September 22, 2010, well after the fall semester had commenced, precluding the general student body from enrolling.

Convinced that the course violated both University regulations and NCAA guidelines, Hedden reported the violation to the NCAA.

In February 2011, Hedden filed a second report with the NCAA detailing how grades for a different player on the women's basketball team had been changed to ensure her continued academic eligibility. The player failed a course but the "F" was changed to "incomplete," and she remained eligible. When Hedden questioned the professor, the grade was changed back to "F." Then, another professor, the same one who taught the "History of Spain" course, changed the player's Spanish grade from a C+ to a B+, which kept her GPA above 2.0 and maintained her eligibility.

On May 2, 2011, the University terminated Hedden's contract. Among the reasons given for Hedden's discharge, was his failure to provide adequate supervision of the women's basketball program. The University cited Hedden's failure to take immediate action against the student athlete regarding her eligibility and his failure "to timely notify his supervisor of . . . possible NCAA violations . . . regarding the women's basketball summer 2011 Spain/France tour."

2

The NCAA opened an investigation, filed a complaint, and requested that Kean and Sharp provide responses to the allegations. Sharp retained counsel to represent her in the investigation.

Included in Sharp's response to the NCAA was an email she wrote on January 29, 2010, to Kean's General Counsel, Michael Tripodi, which was copied to Philip Connelly, Kean's Executive Vice-President of Operations and Hedden's immediate supervisor. Sharp's email contained an attached draft of a fundraising letter she intended to distribute to raise money for the trip to Spain. Sharp's only request to Tripodi was simply to review the draft letter. Nothing in her three-sentence email suggests she was seeking legal advice from Tripodi. Tripodi claims that he reviewed the letter and gave Sharp a verbal response.

The attorney-client privilege, which is codified at N.J.S.A. 2A:84A-20 and appears in N.J.R.E. 504, provides that "communications between lawyer and his client in the course of that relationship and in professional confidence, are privileged[.]" The privilege is restricted to "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance . . . ." Fisher v. United States, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577, 48 L. Ed. 2d 39, 51 (1976). Before the privilege can be recognized, it is "vital to the

3

privilege . . . that the communication be made <u>in confidence</u> for the purpose of obtaining <u>legal</u> advice <u>from the lawyer</u>." <u>United States v. Kovel</u>, 296 <u>F.</u>2d 918, 922 (2d Cir. 1961).

Sharp's email meets neither of these criteria. It does not expressly seek legal advice and nothing in the simply and briefly worded message can be reasonably interpreted, in my view, as doing so. Moreover, Sharp's act of copying Connelly, who was not a member of the University's legal department, is an indication that she did not intend that her communication with Tripodi would be confidential.[2] There is no support in the record for the conclusion that either party had a reasonable expectation that the email would remain confidential.

The purpose of the email appears more in the nature of a request for permission to fundraise, than an appeal for legal advice. Sharp was also seeking approval and placing the University on notice of a trip/course offering that was sure to generate controversy. This conclusion finds support in Sharp's statement to the NCAA where she indicates that she <u>only</u> went to Tripodi when she could not get a response from plaintiff:

---

[2] The majority notes that Sharp's act of copying Connelly on her email does not, standing alone, defeat the privilege. <u>Ante</u> at _____ (slip op. at ____). I agree. However, copying Connelly, Hedden's supervisor, is another indication that Sharp was not seeking confidential legal advice from Tripodi, but permission for the trip to Spain, and she only contacted Tripodi and Connelly when she was unable to discuss the trip with Hedden.

> As a result of Hedden's refusal to discuss the course idea and provide any help or suggestions with generating financial support for the trip with Sharp, Sharp communicated with Kean General Counsel Mike Tripodi ("Tripodi") and Kean Executive Vice President for Operations Phil Connelly ("Connelly") by email on January 29, 2010.

Sharp's response does not support Tripodi's claim that he "conveyed [his] legal opinion regarding the letter." Rather, Sharp indicates that her "memo resulted in Connelly contacting [her] and offering his support for her project." This confirms that through her email Sharp sought and received University support for the trip to Spain, not legal advice.

The conclusion of the majority that "there would be no plausible reason for [Sharp's] request other than to solicit legal advice," ignores the clear content of the email and assumes that all communications with someone in Tripodi's position must be made for the purpose of seeking legal advice. The case law analyzing the attorney-client privilege does not support such a broad interpretation.

"'[D]ocuments do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer.'" Tractenberg v. Twp. of W. Orange, 416 N.J. Super. 354, 376 (App. Div. 2010) (quoting United States v. Robinson, 121 F.3d 971, 975 (5th Cir. 1997), cert. denied, 522 U.S. 1065, 118 S. Ct. 731, 139 L. Ed. 2d 669 (1998)). "Communications

5

which relate to business rather than legal matters do not fall within the protection of the privilege[,]" Leonen v. Johns-Mansville, 135 F.R.D. 94, 98 (D.N.J. 1990)), and, therefore, "the general rule is 'while legal advice given to a client by an attorney is protected by the privilege, business advice generally is not.'" La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp., 253 F.R.D. 300, 305 (quoting In re Nat'l Smelting of N.J., Inc. Bondholders' Litig., 1989 U.S. Dist. LEXIS 16962, at *18 (D.N.J. June 29, 1989)); see also United States v. Davis, 636 F.2d 1028, 1043 (5th Cir.) (communications made to an attorney to prepare a tax return were not privileged because such work is primarily an accounting service), cert. denied, 454 U.S. 862, 102 S. Ct. 320, 70 L. Ed. 2d 162 (1981).

Nor, am I convinced that Tripodi's certification provides proof that Sharp was seeking legal advice. Placed in context, the certification was submitted only after the motion judge noted that

> the email does not expressly indicate that
> general counsel's review was for the purpose
> of obtaining legal advice. In addition, the
> [d]efendants did not attach a certification
> from Mr. Tripodi or Ms. Sharp indicating and
> certifying to their personal knowledge
> concerning the purpose of the email.

Defendants' motion for reconsideration relied on Tripodi's certification, in which he stated, "I understood from Ms.

6

Sharp's January 29, 2010 email that, in her official capacity as the Women's Basketball coach, she wanted me to review the draft letter and confirm whether any legal issues were implicated." However, Sharp's email makes no such request and her response to the NCAA flatly contradicts this assertion. Sharp confirms that her email resulted in Connelly contacting her and scheduling a follow-up meeting to discuss the trip to Spain.[3] Sharp gives no indication that she received any response from Tripodi.

Nothing in Sharp's three-sentence email supports Tripodi's claim that she was seeking legal advice. This conclusion is reinforced by the University's failure to object when Sharp enclosed the email in her January 23, 2012, response to the NCAA Notice of Allegations. In his certification, Tripodi acknowledges that he received a copy of Sharp's response to the NCAA containing the January 29, 2010 email on January 25, 2012. He now claims that Sharp was not acting in her official capacity as an employee of the University when she disclosed the email to the NCAA and her disclosure "was not authorized by the holder of the privilege, the University." However, there was no assertion of the attorney-client privilege by the University until February 13, 2013, more than one year after Sharp's disclosure to the NCAA. Not until plaintiff requested a copy of the

_____

[3] This meeting on February 18, 2010, was not attended by Tripodi.

7

email, which had been redacted from a discovery response, did the University assert a claim of attorney-client privilege to prevent plaintiff's discovery of the email.

Tripodi does not explain why the University sat idly by when a purportedly privileged document was disclosed to the NCAA, but reacted swiftly and emphatically when Hedden sought a copy of the email. Nor does he explain how Sharp was acting in her official capacity when she sent the email to him but was not acting in that capacity when she responded to the NCAA. Had the University truly been concerned with Sharp's "unauthorized" disclosure of a privileged document to the NCAA, as it now maintains, some sort of objection would have been expected.

The University's inaction may have resulted from a perception that Sharp's email was seen as helpful to the common interests of Sharp and the University in avoiding NCAA sanctions, as it showed that Sharp sought advance approval of the trip to Spain. The use of the email in Hedden's CEPA case, however, poses significant problems for the University because, as the motion judge noted, it "corroborates, to some degree, the [p]laintiff's claim that Michele Sharp worked with several high level officials to arrange the trip without notifying the [p]laintiff."

8

The attorney-client privilege should not be the subject of such arbitrary, selective, and opportunistic enforcement and cannot be doffed and donned like a raincoat on a cloudy day. See Permian Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981) ("The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.") To permit this selective assertion of the privilege by the University denies plaintiff access and use of a critical document that the University gave its implied consent to use in another proceeding.

Because I find the University's assertion of privilege to be unsupported by the facts and the law, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

9