**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1810-19T2

STANISLAV ROYZENSHTEYN
and ROMAN GERASHENKO,

    Plaintiffs-Appellants,

v.

PRASHANT PATHAK, CAREY
KURTIN, EKAGRATA, INC.,
IN COLOUR CAPITAL, INC.,
ONYX ENTERPRISES CANADA,
INC., and J. WILLIAM KURTIN,

    Defendants-Respondents,

and

ONYX ENTERPRISES INT'L
CORPORATION,

    Defendant.

_____

Argued telephonically May 26, 2020 –
Decided August 6, 2020

Before Judges Messano, Ostrer and Vernoia.

On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C-000045-18.

Daniel Ginzburg argued the cause for appellants.

Brian J. Pendleton, Jr. argued the cause for respondents (DLA Piper LLP (US), attorneys; Brian J. Pendleton, Jr., Marc A. Silverman, Amanda Laufer Camelotto, Kristin A. Pacio, Jenny Xiaoying Zhang, and Gina Trimarco, on the brief).

PER CURIAM

Plaintiffs Stanislav Royzenshteyn and Roman Gerashenko formed Onyx Enterprises Int'l Corp. (Onyx), a New Jersey corporation, in 2008 and were its sole shareholders and directors until 2015.[1] That year, in exchange for a capital investment in the corporation (the transaction), plaintiffs agreed that defendants Prashant Pathak and Carey Curtin (Carey), residents of Ontario, Canada, would become majority shareholders and directors in Onyx.[2] Pathak, through his private equity firm Ekagrata Inc. (Ekagrata), and Carey formed In Colour Capital, Inc. (ICC), and Onyx Enterprises Canada, Inc. (OEC), to facilitate the

---

[1] We provide context for the dispute through reference to the allegations contained in plaintiff's second amended complaint filed in July 2019.

[2] Because Carey Curtin's father, J. William Kurtin (William), is also a defendant, we use their first names to avoid confusion. We intend no disrespect by this informality.

transaction. William, another Ontario resident, was allegedly the source of funds for the investment.[3] Plaintiffs claimed to have agreed to the terms of the transaction because Pathak allegedly assured them that Canadian Tire Corporation (CTC), a multi-billion-dollar Canadian company with which Pathak had influence, agreed to acquire a stake in Onyx. CTC never did.

Following the closing, plaintiffs were minority shareholders in Onyx, and OEC owned the majority of its shares. Disputes arose shortly after the transaction closed in July 2015. Plaintiffs' second amended complaint claimed among other causes of action that defendants committed legal and equitable fraud in the inducement, securities fraud, breach of fiduciary duties, minority shareholder oppression, and interference with plaintiffs' prospective economic relations. Plaintiffs sought rescission of the transactional agreements and a return to the status quo ante before the transaction, plus compensatory and punitive damages.

In addition to a general denial, defendants filed a counterclaim asserting, in part, breach of contract, shareholder oppression, breach of fiduciary duty, unjust enrichment, and conversion. They sought an accounting, imposition of a

---

[3] Throughout the opinion, our use of "defendants" refers to Pathak, Carey, William, Ekagrata, ICC and OEC, but not Onyx.

constructive trust, a forced sale of plaintiffs' Onyx shares to OEC, or conversely, plaintiffs' forced purchase of OEC's shares in Onyx, or the forced sale of Onyx to a third-party buyer, and other relief.

After plaintiffs responded to defendants' discovery requests, defendants moved to compel plaintiffs' further production due to allegedly inadequate responses. In his January 2019 order, the judge granted defendants partial relief and required plaintiffs to produce a revised privilege log that was in "readable form." In March, defendants moved for sanctions because of plaintiffs' non-compliance with the January order. It is unclear from the record how the court resolved that motion.

Plaintiffs did not furnish the revised privilege log until July 17, 2019, identifying 1276 communications over which plaintiffs asserted attorney-client privilege. In a July 25, 2019 letter to plaintiffs' counsel, defense counsel noted the upcoming discovery end date and claimed that plaintiffs were improperly refusing to produce the communications "based on Onyx's privilege." Counsel claimed that as majority shareholder of the company, OEC possessed the privilege, not plaintiffs. In addition, defendants claimed there were "no attorneys involved in [some] emails" listed in the log, and others involved attorneys who did not represent either plaintiffs or Onyx. Lastly, defendants

4

asserted there were "at least [two-hundred-ninety-one] communications that [p]laintiffs [were] not even involved in[.]"

In an email to defense counsel, plaintiff's counsel asserted that his clients "own the privilege on their emails prior to July 17, 2015[,] because they were looking to sell their own shares in exchange for funding for Onyx." He ultimately advised defense counsel to make his threatened motion to compel production as necessary. On July 31, 2019, defendants again moved to compel further document production from plaintiffs.

The judge heard oral argument on defendants' motion. Defense counsel reprised the arguments made in his letter to plaintiffs' counsel. He also noted that Onyx's attorney, who was present in court, was not asserting any privilege over the items in the log. Defense counsel also argued that plaintiffs waived any claim of privilege by asserting fraud in the inducement, thereby making their knowledge, state of mind and any reliance on defendants' representations critical issues in the lawsuit.

Plaintiffs' counsel argued that his clients retained the right to assert the attorney-client privilege because Onyx was a "closely-held corporation[.]" He claimed that even if the privilege was the corporation's, Royzenshteyn, as its

chief executive officer, had not waived the privilege and Onyx's board of directors had not approved release of the communications.

The judge asked if plaintiffs objected to Onyx's counsel reviewing the putatively privileged communications. Plaintiff's counsel responded, "My clients only have an objection . . . as to the transaction-related documents, . . . because again . . . they control the privilege as to those documents because they were the clients . . . ." The judge reserved decision.

The judge's October 25, 2019 order (the October order) required plaintiffs to "produce all documents identified on their revised privilege log." Plaintiffs moved for reconsideration and to quash defendants' subpoenas duces tecum and ad testificandum served on David Sorin, a lawyer intimately involved with the transaction and a partner at McCarter & English (McCarter). The judge entered two orders on December 20, 2019 (the December orders), denying the requested relief. He also entered an order on December 23, 2019, denying plaintiffs' motion for a stay.

We granted plaintiffs' motion for leave to appeal, but only as to the orders "related to the compelled production of documents over which plaintiffs assert attorney-client privilege." We entered a stay pending our further review, and we required plaintiffs to file their privilege log, along with copies of the

6

allegedly privileged communications referenced in the log, for our in camera review.

I.

In large part, the crux of plaintiffs' appeal involves the nature and scope of Sorin's retention. During the fall of 2014, negotiations with defendants were progressing. Royzenshteyn sent an email to Sorin on December 21, 2014, thanking him for a meeting earlier that day, and stating: "Although we have no NDA [non-disclosure agreement] in place, I assume all information is confidential based on 'Attorney Client Privilege.'" Sorin responded in short order, "Yes, everything is indeed confidential. No worries on that front whatsoever."

However, it was not until April 24, 2015, that, expressly on behalf of Onyx, Royzenshteyn countersigned an engagement letter sent by Sorin. Sorin specified that McCarter would "provide legal services to Onyx," and "represent Onyx . . . in connection with a proposed transaction with Ekagrata . . . ." A separate "Terms of Engagement" document accompanied Sorin's letter and made clear that McCarter's representation was limited to "you," a term defined as the "client or clients identified in [the] engagement letter." The term did not include "[i]ndividuals or entities that [were] related to or affiliated with you, such as

7

partners, officers, directors, stockholders, parent companies, related companies, or family members, [who] are not clients, unless we otherwise agree in writing." In his deposition, when asked whether he was "represented by counsel on all the transactions" with defendants through July 2015, Royzenshteyn replied, "Onyx was."

The transaction closed on July 17, 2015, with the execution of five agreements: the Preferred Stock and Warrant Purchase Agreement; the Investor Rights Agreement; the Stockholders Agreement; and two, three-year employment contracts, one with each plaintiff. Onyx was a signatory on all five documents. Sorin drafted only the employment agreements and submitted them to defendants' counsel for approval. At closing, OEC paid Onyx $5 million, approximately $1.5 million of which cancelled Onyx's indebtedness to OEC as the result of a bridge loan, and Onyx issued fifty-two percent of its voting shares to OEC. Under the Stockholders Agreement, plaintiffs, Pathak and Carey became Onyx's board of directors.[4]

In a written statement of reasons supporting the October order, apparently without conducting any review of the communications in the privilege log, the

---

[4] We need not discuss the disputes that ensued or the court appointment of a fifth director.

judge provided several alternative reasons for rejecting plaintiffs' claim of privilege over all the communications in the log. Given "the patent language of the retainer agreement," the judge rejected plaintiffs' contention that they, not Onyx, were "the clients [r]elated to the transaction." The judge also stated that "[e]ven if [p]laintiffs were clients, they would . . . be joint[]clients with Onyx and would be unable to assert privilege against Onyx. . . . Defendants, like [p]laintiffs, own the privilege and have an equal right to access it."

The judge further determined that even if plaintiffs "could shield Onyx's privilege from [d]efendants, . . . [p]laintiffs have waived any such privilege[,]" because they had "affirmatively placed the subject of [their] own privileged material at issue in th[e] litigation, and ha[d] selectively produced numerous communications with Onyx's attorney for the transaction."[5] The judge concluded that "[p]laintiffs' allegations put their pre-investment communications . . . as to what they expected and knew about [CTC's] involvement in the transaction squarely at issue here."

The judge also noted that plaintiffs failed to address nearly three hundred communications in the privilege log which seemingly did not include plaintiffs

---

[5] This was a specific reference to a limited number of emails to or from Sorin or others at McCarter that plaintiffs produced without reservation.

at all. He reasoned that as to those, "a person cannot assert privilege over communications to which they are not a party."

Although we have not been supplied with the motion for reconsideration and its supporting documents, we discern the basis of plaintiffs' motion from the judge's written statement of reasons supporting the December orders. Plaintiffs argued that in concluding Onyx was McCarter's client, the judge overlooked N.J.S.A. 2A:84A-20(3), see N.J.R.E. 504(3), which defines a client as "a person . . . that . . . consults a lawyer . . . for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity[.]"[6] Plaintiffs claimed they had consulted Sorin for legal advice regarding the transaction and, therefore, they were his clients. They noted that all the circumstances of the transaction supported the conclusion that plaintiffs never consented to be excluded as clients of McCarter. Plaintiffs further argued that even if the privilege was Onyx's privilege, neither the company nor its board of directors had taken steps to waive it.

Plaintiffs further argued they did not waive any privilege "by affirmatively placing the subject of their privileged material at issue in this litigation," or by

---

[6] Throughout the balance of the opinion, we shall refer solely to the Rules of Evidence without referencing their corresponding statutory citations.

"selectively producing communication between them and McCarter." Lastly, plaintiffs contended the judge erred by ordering them to produce "every single email in their [p]rivilege [l]og," because some communications were with other counsel, including plaintiffs' present counsel, "on issues relating to this litigation."

The judge concluded that "a motion for reconsideration [was] not the place to debate McCarter's alleged misconduct." He found the McCarter engagement letter, along with the terms and conditions, "was evidence enough . . . that McCarter represented Onyx, not . . . [p]laintiffs." Rejecting plaintiffs' argument that Onyx's status as a closely held corporation bestowed the privilege on them individually, the judge concluded that Onyx was "constructed more like a corporation rather than a partnership." Finally, the judge determined that plaintiffs had "not offered evidence to show . . . the [c]ourt's conclusions were palpably incorrect or failed to consider probative evidence."

## II.

Before us, plaintiffs argue they, not Onyx, were clients of McCarter, particularly given Onyx's status as a closely held corporation. Plaintiffs contend it was unreasonable considering all the circumstances to conclude that McCarter only represented Onyx. They also contend that if McCarter only represented

Onyx, it would have violated the Rules of Professional Conduct (RPC), specifically, RPC 1.2(c), because they never consented to McCarter's limited representation of Onyx alone, and they were entitled to rely on Sorin's assurance that all communications were confidential. Plaintiffs further argue that even if they share the privilege with Onyx, neither can waive the privilege as to third parties without the other's consent, and defendants' status as shareholders and directors of Onyx "does not entitle them to access the privileged communications." In addition, plaintiffs contend it was error for the court to conclude they waived the privilege over any documents, either through selectively producing some emails or by asserting fraud claims against defendants. Lastly, plaintiff argue it was error to order them to produce all the communications, because some were clearly privileged.

"We 'normally defer to a trial court's disposition of discovery matters . . . unless the court has abused its discretion[,]' or the decision is based on 'a mistaken understanding of the applicable law.'" Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013) (alteration in original) (quoting Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559 (1997)). "Because '[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference[,]' we review the applicability of the attorney-

client privilege, and its potential waiver in this case, de novo." Ibid. (alterations in original) (quoting Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We conclude the record is inadequate for us to resolve all the points now raised as they relate to every entry in the privilege log. In our view, the trial court was required to conduct an in camera review of the specific communications in the privilege log before ordering plaintiffs to supply all of them to defendants. See Corsie v. Campanalonga, 317 N.J. Super. 177, 184 (App. Div. 1998) ("There is abundant authority for the proposition that in camera review of claimed confidential material is an approved and essential step when a privilege is invoked." (citations omitted), rev'd in part, 160 N.J. 473 (1999)).

Initially, "only . . . in camera inspection of the documents by the trial judge" can determine if any of the communications "were made within [counsel's] professional capacity as a lawyer" for plaintiffs. United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 563 (App. Div. 1984). Furthermore, in an analogous situation involving a closely held corporation, we have held that a hearing might be necessary to determine the identity of the client and whether a law firm should be disqualified from further representation based on

professional advice rendered to one of the principals of the corporate defendant. Comando v. Nugiel, 436 N.J. Super. 203, 208, 218–19 (App. Div. 2014). See also McCarthy v. John T. Henderson, Inc., 246 N.J. Super. 225, 232–35 (App. Div. 1991) (court found absence of personal attorney-client relationship only after evidentiary hearing).

Even though plaintiffs' assertion of fraud and their reliance on defendants' misrepresentations may affect consideration of whether the privilege is waived, see, e.g., Blitz v. 970 Realty Assocs., 233 N.J. Super. 29, 37–38 (App. Div. 1989), as we said in Dontzin v. Myer, "we do not imply that an allegation of fraud automatically would justify piercing the privilege[,]" 301 N.J. Super. 501, 511 (App. Div. 1997). An in camera review is needed to limit any waiver to those documents that would directly rebut the essence of the claimed misrepresentation and reliance. See Weingarten v. Weingarten, 234 N.J. Super. 318, 329–31 (App. Div. 1989) (in camera review needed to determine subject and scope of claim and hence of the implied waiver); Wolosoff, 196 N.J. Super. at 567–68. In a somewhat analogous context involving a claim of privilege and the defendant's asserted affirmative defense, the Court said, "[T]he trial court should conduct an in camera review of the materials at issue to determine if the privilege applies to specific documents, and, if so, whether those documents are

so tenuously related to the affirmative defense that waiver is overcome despite the assertion of that defense." Payton, 148 N.J. at 554.

We therefore reverse the orders under review and remand for further proceedings consistent with this opinion.

III.

We set some guideposts to assist the court on remand. "[T]he attorney-client privilege generally applies to communications (1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made in confidence, (4) by the client." Hedden, 434 N.J. Super. at 10 (citing Metalsalts Corp. v. Weiss, 76 N.J. Super. 291, 297 (Ch. Div. 1962)). The client, as holder of the privilege, may waive the privilege and disclose the communication. N.J.R.E. 530. In addition, our courts have "recognize[d] implicit waiver of the attorney-client privilege 'where the [client] has placed in issue a communication which goes to the heart of the claim in controversy.'" In re Grand Jury Subpoena Issued to Galasso, 389 N.J. Super. 281, 298 (App. Div. 2006) (second alteration in original) (quoting Kinsella v. Kinsella, 150 N.J. 276, 300 (1997)); accord Wolosoff, 196 N.J. Super. at 567.

Of course, in this case, a critical issue was the identity of McCarter's client. The judge at first blush seemingly accepted, as a matter of law, that the

retainer agreement was between McCarter and Onyx, and, under its explicit terms, Onyx, not plaintiffs, was McCarter's client, and it, not plaintiffs, held the privilege. The judge did not specifically address the numerous entries in the privilege log, dated both before and after the transaction closed, between plaintiffs and other lawyers, although it seems the judge implicitly accepted defendants' claim that Onyx was the client in all those instances, since he ordered disclosure of every item in the log.

N.J.R.E. 504(3)(a) provides: "'client' means a person or corporation . . . that, directly or through an authorized representative, consults a lawyer or the lawyer's representative for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity[.]" A communication made in the course of that attorney-client relationship is presumed confidential. N.J.R.E. 504(3)(b). The attorney-client "relationship is governed both by the [RPC] and the Supreme Court's exclusive jurisdiction to regulate the conduct of attorneys." Kamaratos v. Palias, 360 N.J. Super. 76, 84 (App. Div. 2003) (citing N.J. Const. art. VI, § 2, ¶ 3).

When a corporation retains an attorney, the attorney normally represents "the [corporation] as distinct from its directors, officers, employees, members, shareholders or other constituents." RPC 1.13(a). There is no exception for

16

closely held corporations. McCarthy, 246 N.J. Super. at 230. Plaintiffs cite several out-of-state decisions and ask us essentially to adopt a new rule of law applicable to subchapter S corporations, which, we acknowledge, the Internal Revenue Code treats as partnerships for federal tax purposes. DeVito v. Sheeran, 165 N.J. 167, 171 n.1 (2000). Plaintiffs urge us to accept that shareholders in a closely held corporation hold the privilege individually and distinctly from the corporate entity. We decline the invitation. See McCarthy, 246 N.J. Super. at 231 (noting our courts have rarely "disregarded the corporate form and determined that the principals of the corporation were indistinguishable from the corporation itself").

An attorney "may also represent any of [the corporation's] directors, officers, employees, members, shareholders or other constituents," although each client must consent to "the dual representation" if it would involve "a concurrent conflict of interest." RPC 1.7; RPC 1.13(e). Furthermore, "[i]n dealing with a[] [corporation]'s directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer believes that such explanation is necessary to avoid misunderstanding on their part." RPC 1.13(d).

"Where [two] or more persons have employed a lawyer to act for them in common, none of them can assert such privilege as against the others as to communications with respect to that matter." N.J.R.E. 504(2); see also Biunno, Weisbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 504 (2019) ("Where two or more persons employ the same attorney to act for them in common, no one of the clients may assert the privilege against any one or all of the others." (citing Aysseh v. Lawn, 186 N.J. Super. 218, 227 (Ch. Div. 1982))). This "common interest exception only applies when the parties 'have employed a lawyer to act for them in common.'" In re Envtl. Ins. Declaratory Judgment Actions, 259 N.J. Super. 308, 315 (App. Div. 1992) (quoting then Evid. R. 26(2)(c)).

Viewing the record in its entirety, we reject plaintiffs' claims that they were McCarter's sole clients for purposes of the transaction, although we cannot say, because the trial court did not decide, whether plaintiffs were the sole clients of other attorneys and law firms whose communications appear in the privilege log. However, the record before us suggests the possibility that Sorin and the firm were representing both Onyx and plaintiffs. Sorin told Royzenshteyn, prior to execution of a formal retainer agreement, that their communications would remain confidential, and the only closing documents

A-1810-19T2

Sorin drafted were the two employment contracts for plaintiffs. The balance of the closing documents were not drafted by Sorin or McCarter. Onyx executed all five of the agreements, yet the record reveals that plaintiffs worked directly with Sorin regarding the terms of the employment contracts. See Petit-Clair v. Nelson, 344 N.J. Super. 538, 543–44 (App. Div. 2001) (rejecting the plaintiff's arguments that he only represented the defendants' corporations because the retainer agreement was signed by one of the defendants in his corporate capacity).

We cannot conclude with certainty that McCarter was in fact providing joint representation, or when that joint representation commenced. In the first instance, that requires careful in camera consideration of the specific communications between plaintiffs and the firm's lawyers and may necessitate a plenary hearing as to when such joint representation arose. See, e.g., Comando, 436 N.J. Super. at 208 (noting the need for evidentiary hearing before deciding potential disqualification of law firm based on alleged individual representation of the plaintiff and the limited liability company in which she had an interest). Nevertheless, on the record before us, to the extent that the judge held the privilege was solely Onyx's to waive, we disagree.

If, following remand, the court concludes that for some or all of McCarter's involvement or the involvement of other attorneys, the firm or attorney jointly represented plaintiffs and Onyx, then plaintiff cannot assert the privilege against Onyx, a defendant in this suit on plaintiffs' derivative oppressed minority shareholder claim. Aysseh, 186 N.J. Super. at 227. Plaintiffs argue that Onyx cannot waive the privilege as to third parties, i.e., Pathak, Carey and other defendants in this lawsuit.

However, the wrinkle in this case is that Pathak and Carey are OEC's representatives on Onyx's board, they serve as directors of the corporation, and, therefore, they are part of Onyx's post-transaction management. Defendants claim that as new management, they have the right on behalf of the corporation to waive the privilege as to all communications. See Hedden, 434 N.J. Super. at 15 (the privilege and control of the privilege belong to "the organizational client, namely, the officers and directors of the organization" (citing Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985))). In Oswall v. Tekni-Plex, Inc., we considered whether it was appropriate to disqualify corporate counsel from personally representing the defendant corporation's former president in a suit brought by a former employee. 299 N.J. Super. 658, 660–61 (App. Div. 1997). We quoted with approval the United States Supreme

Court's exposition of who may assert or waive the attorney-client privilege

following a change in corporate management:

> [W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.
>
> [Id. at 669 (alteration in original) (quoting Weintraub, 471 U.S. at 349).]

Accord In re Estate of Fedor, 356 N.J. Super. 218, 220–21 (Ch. Div. 2001)

("management" means current management); see also N.J.S.A. 14A:10-6(c)

(after merger or consolidation, the "surviving or new corporation shall . . .

possess all rights, privileges, powers, immunities . . . of each of the merging or

consolidating corporations").[7]   On the record before us, however, there is no proof that Onyx has in fact formally waived the privilege.[8]

On remand, after its in camera review to determine whether plaintiffs may assert the privilege with respect to any communications in the privilege log, if the court determines there was joint representation provided by an attorney or firm, it must then determine whether Onyx formally waives the privilege. Thereafter, if plaintiffs continue to assert privilege as to a disputed communication, the court must decide whether plaintiffs may still assert the privilege as to third parties, i.e., the defendants in this lawsuit, despite Onyx's corporate waiver of the privilege.

---

[7] The transaction documents included a choice of law provision, with the parties agreeing that Delaware law was to apply.  In Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP, which involved factual circumstances very similar to those presented here, the court held that under Delaware General Corporate Law, analogous to N.J.S.A. 14A:10-6(c), the attorney-client privilege passed to and could be exercised by the surviving corporation as a matter of law. 80 A.3d 155, 160–62 (Del. Ch. 2013) (construing Del. Code Ann. tit. 8, § 259(a) (2020)).  We do not hold that Delaware law controls the issues in this case; however, the decision provides persuasive authority for interpreting our statute.

[8] We decline to consider in the first instance plaintiffs' collateral assertion that Pathak and Carey have a disqualifying conflict of interest and may not vote as directors regarding Onyx's waiver of the privilege.  Plaintiffs are free to make that argument in the trial court.

IV.

Our cursory review of plaintiffs' privilege log and some of the underlying communications demonstrates that plaintiffs must be required to provide the trial court with more detail regarding their assertion of privilege. Plaintiffs claim privilege over communications from June 2014, one year before the transaction, through December 2017, after this litigation commenced. As already noted and recognized by the trial court, plaintiffs themselves are not parties to hundreds of these communications.

There are communications between plaintiffs and others with attorneys — not Sorin or others affiliated with McCarter — that date both before and after the transaction. The record before us includes some information regarding the retention of those attorneys and the nature or their representation. But the existing record does not answer all the questions we have raised above regarding the identity of the client, whether representation was a joint representation, and the nature and scope of legal services provided by each attorney or firm.

To facilitate what we recognize will be an arduous in camera review, we order plaintiffs to provide the judge with a detailed explanation of why the attorney-client privilege applies to each of the 1276 communications identified in their privilege log, and to identify those communications for which plaintiffs

23

assert they alone were the clients with appropriate support for that proposition. Without deciding the issue, and without foreclosing plaintiffs from making any argument to the trial court, from our cursory review, it does not appear that plaintiffs alone were the clients in a large percentage of communications that preceded the closing of the transaction. Conversely, communications between plaintiffs and attorneys other than Sorin or other McCarter attorneys that post-date the transaction are likely subject to the privilege, absent a finding of implicit or explicit waiver.

Plaintiffs may file the explanation under seal, for the trial court's in camera review, along with any objections regarding the relevancy of the communication to facts at issue in the litigation. See Wolosoff, 196 N.J. Super. at 567 n.3 ("Wholly irrelevant communications before and after settlement negotiations having no possible bearing on this question remain protected by the attorney-client privilege."). This will assist the court in tailoring any disclosures based on an explicit or implicit waiver of the privilege as appropriate.

We reverse the orders that required plaintiffs to produce all communications listed in the privilege log and denied their motion for

reconsideration.  We remand the matter to the trial court for further proceedings consistent with this opinion.[9]  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] There was reference in the record to the trial court's appointment of a discovery master.  We have no idea whether that occurred and if the discovery master remains in place.  We do not foreclose the judge's referral of these issues to the discovery master for examination and recommendations to the court.

A-1810-19T2