642 A.2d 389

IN THE MATTER OF BERNARD S. BERKOWITZ,
AN ATTORNEY AT LAW.

IN THE MATTER OF JAMES P. DUGAN,
AN ATTORNEY AT LAW.

Argued February 1, 1994—Decided June 17, 1994.

*Michael J. Sweeney,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Todd M. Sahner* argued the cause for respondent Bernard S. Berkowitz (*Hannoch Weisman,* attorneys).

*Dominic J. Aprile* argued the cause for respondent James P. Dugan (*Bathgate, Wegener, Dugan & Wolf,* attorneys).

PER CURIAM.

This attorney disciplinary matter arose from a formal complaint charging two attorneys, partners in a large law firm, with representing two parties with actual or potentially adverse interests. One of the parties was a manufacturing concern whose operations were threatened by a proposed land development sought by the other party.

The case presents the issue whether two attorneys, aware of the different concerns of their respective clients, violated our rules of ethics in failing to recognize and to resolve the possible conflict of interest between the clients. That issue must be addressed in light of the fact that the lawyers were partners in the same law firm and the additional circumstance that one of the attorneys had a personal proprietary interest in a business venture of his client—the client whose interests were adverse to another client of the firm.

I

The respondents are Bernard S. Berkowitz and James P. Dugan, partners in the law firm known as Hannoch Weisman. A formal complaint was filed by Lewis Ripps. The complaint alleged that Berkowitz represented Palmer Asphalt ("Palmer"), a New Jersey corporation that manufactures roofing materials, in

which Ripps was a principal. Berkowitz represented Palmer at the same time Berkowitz's partner Dugan represented Bay Bridge Associates ("Bay Bridge"). The complaint charged that Bay Bridge had been the proponent of a zoning ordinance to authorize the residential development of property that was contiguous to the land on which Palmer's warehouse was situated, and that during that time Dugan had had a business interest in Bay Bridge. The complaint claimed that respondents had been in violation of the Rules of Professional Conduct ("RPC"), specifically, *RPC* 1.7(a) and *RPC* 1.8(a).

The District Ethics Committee ("DEC") found that *RPC* 1.8(a), which provides generally that a lawyer shall not enter into a business transaction with a client or knowingly acquire an interest adverse to a client, was inapplicable. The DEC also found no violation of *RPC* 1.7(a), which provides that a lawyer shall not, without consent, represent a client if the representation of that client will be directly adverse to another client. The DEC determined that: (1) Ripps had not retained Berkowitz to challenge a zoning ordinance proposed by Bay Bridge; (2) neither Berkowitz nor Dugan had known of Ripps' intention to oppose the rezoning until February 13, 1989, the date of the meeting among Berkowitz, Dugan, and Ripps; (3) neither had known, until February 13, 1989, that the representation of Palmer and Bay Bridge would be directly adverse; and (4) the representation of a client who was engaged in the rezoning of areas surrounding the property owned by another client did not necessarily involve "directly adverse" representation. The DEC recommended that the complaint be dismissed.

Following an appeal by Ripps, on a *de novo* review of the record, the Disciplinary Review Board ("DRB") recommended that the DEC's finding be reversed. In the DRB's view, the evidence clearly and convincingly established that respondents' conduct was unethical. The DRB determined that respondents' conduct, through the application of *RPC* 1.10 (which provides that a lawyer shall not represent a client if any attorney in the same

firm, practicing alone, would be prohibited from doing so) violated *RPC* 1.7. The DRB apparently agreed, however, with the DEC's conclusion that *RPC* 1.8(a) was inapplicable. After balancing the impropriety of respondents' conduct with what it saw as the lack of evil motives on respondents' part and the absence of harm to the client, a five-member majority of the DRB recommended that each respondent receive a public reprimand. One member recommended a private reprimand.

## II

The facts are critical to the issue of whether respondents improperly represented clients with actual or potential conflicts of interest sufficient to constitute unethical conduct. Although many of the facts are not disputed, the parties proffered decidedly different versions of the events that gave rise to the charge of unethical conduct.

In 1988, when the relevant events began to unfold Berkowitz had been Palmer's corporate counsel for twenty-five years. He had also represented its principals, Ripps and Alton Adler, in other legal matters of a personal nature. On December 12, 1988, Palmer held its annual meeting at Hannoch Weisman's offices. Present were Berkowitz, Ripps, Adler, and Martin Goldstein, Palmer's accountant. Palmer's agenda contained sixteen items. The eleventh item on the agenda was a newspaper article announcing that Bay Bridge proposed building a high-rise complex, marina, shopping area, and restaurant on a twenty-acre site. The proposed development surrounded the Palmer warehouse facility on three sides. The article also stated that Bay Bridge would be seeking to rezone the property from heavy industrial to residential and mixed use to accommodate the marina, restaurant, and possibly a theater. The article disclosed that Bay Bridge would be represented by Dugan.

According to Ripps, at Palmer's annual meeting of December 12, 1988, he showed the article to Berkowitz. He described that conversation as follows:

> I brought the article to [Berkowitz's] attention and I told him that I am very much concerned about what I read in the paper, because it seems to be apparently that there's an attempt to rezone an area in which my company is included within the boundaries, because it talks about a proposed 20 acre development which would border North Street on the north, Avenue A on the east and 5th Street on the south. And our plant, all right, our warehouse facility was on 5th Street within those borders. And I was concerned because the article talks about rezoning it for residential use, that I was going to be a nonconforming use, and in addition to which they talk about the fact that the project is going to include 525 residential units, 10 houses, etcetera, etcetera. And I was very alarmed about this, probably because I had the feeling that you bring in 525 residential units in a cooperative ownership, now, I'm going too far, not a single home owners, but 525 people cooperatively working to do whatever it is they could to protect their interests against the interests of my company.... I asked Mr. Berkowitz to, if he could, please help us with this matter, because it was critical to our company, certainly the value of our property. We could not sell our property if it were rezoned for residential use, other than for residential use. And it certainly would not bring the value to our company that the property is worth. And we have a petrol chemical business, I cannot pick up and move it someplace else. This thing was business threatening to me, and the worse [sic] experience I have had in the years I've been in the business.

Ripps further testified that the 13,000–square foot warehouse was crucial to the operation of Palmer's manufacturing business, located across the street, because Palmer had no other place to store raw materials. Ripps also testified that aside from being concerned about the rezoning of the property, he had been worried that the residents of the development would perceive asbestos—used as a raw material in Palmer's compound and stored in the warehouse—as hazardous because of its "terrible reputation." Ripps added that although Palmer had frequently been inspected by the Occupational Safety and Health Administration and had complied with all its regulations, "we still have to confront the public's fears and the public's apprehension."

Ripps stated that he had not then specifically informed Berkowitz that he wanted to oppose the proposed rezoning ordinance because he had been unaware, until February 13, 1989, that a zoning ordinance had actually been proposed. Ripps testified that although he had considered the rezoning and the residential development as a serious threat to his business, he had believed, at that time, that the proposal for an ordinance had been in its

preliminary stages and that, in addition, he would have received formal notice about any changes from the Board of Adjustments, because he owned property affected by the ordinance.

Still, according to Ripps, he requested that Berkowitz handle the zoning matter on Palmer's behalf and Berkowitz agreed. Ripps also understood that Berkowitz would undertake further activities with respect to the proposed zoning change, such as communicating with local authorities and determining from Dugan what the residential development actually entailed. According to Ripps, he expected Berkowitz to handle the matter personally on behalf of Palmer, albeit Berkowitz might seek the assistance of other members of Hannoch Weisman to work with him. That expectation was based on Berkowitz's statement, at the December 12, 1988, meeting, that some attorneys at Hannoch Weisman were land-use experts, and on the fact that, in the past, several attorneys from Hannoch Weisman had handled legal matters on behalf of Palmer that were outside of Berkowitz's legal expertise. Ripps concluded by saying that he had not expressed panic, at the December 12, 1988, annual meeting, because he had turned over the matter to the attention of Berkowitz, who, although professing no knowledge of the residential development and of Dugan's representation of Bay Bridge, nevertheless assured Ripps that he would ask Dugan about it. In fact, Berkowitz suggested that Ripps meet with Dugan to determine if the residential development would affect Palmer's property. Also on December 12, 1988, after Palmer's annual meeting, Berkowitz discussed the matter with Dugan, who informed him that the firm had represented Bay Bridge for a number of years.

That day or the next, Berkowitz discussed with Dean Gaber, Esq., the Chairperson of Hannoch Weisman's executive committee, and the person whom Berkowitz consulted on conflict-of-interest issues, whether the firm could continue to represent Palmer in other matters that were being handled by the firm, should Palmer object to the zoning ordinance. According to Berkowitz, he and Gaber "poured over the ethics rules" and

concluded that so long as the firm did not represent Palmer "in opposition to one of our clients," the firm could continue to represent Palmer in other matters.

Ripps testified that between December 12, 1988, and February 13, 1989, he made thirteen telephone calls to Berkowitz to inquire about the progress of the matter. He was unable to remember whether he had spoken to Berkowitz all thirteen times, but he contended that all the conversations must have been about the rezoning matter, as they had no other outstanding Palmer matters to discuss. According to Ripps, he received little or no response from Berkowitz, but he "thought nothing of it because [he] had tremendous confidence in Berkowitz."

On February 13, 1989, Ripps met with Berkowitz and Dugan. The record reflects that Berkowitz billed Palmer for three conferences with Dugan, including that meeting. Ripps recalled that at the February 13, 1989, meeting, Dugan confirmed that he represented Bay Bridge and asked Ripps to "keep an open mind" about the sale of the property to Bay Bridge. According to Ripps, when he asked Dugan if there was "any public process in place," Dugan's vague reply was, "yes, later on this month." Ripps then recounted how, when Dugan stepped out of the meeting for a few minutes, Berkowitz remarked "you know, Lewis, he said, I wouldn't be surprised if Jimmy has a little interest in this, because that's—he does that in other kinds of investments he gets involved in and represented clients that he has."

When Ripps became suspicious of Dugan's vague reference to a public process or meeting "later on this month," he went to the planning-board office and discovered that a meeting of the planning board would be taking place the very next evening. Berkowitz' testimony confirmed that Dugan had not said that "the meeting is tomorrow," although Dugan could not recall discussing the date of the planning-board meeting at that time.

Thereafter, Ripps telephoned Berkowitz and "expressed tremendous alarm." According to Ripps, he asked Berkowitz:

what is it I'm supposed to do, we have this hearing tomorrow night and, you know, can you come down and represent us?  I said, I don't know whether you can or you can't represent us and I don't want to be stuck tomorrow evening.  And I think we more or less mutually agreed Berkowitz would not be able to represent us that next evening and/or should not represent us that evening.  And I, later that evening, called and imposed upon a longstanding relationship with Feinberg to represent us.

Indeed, William M. Feinberg, Esq., testified that Ripps had contacted him at home on the evening of February 13, 1989, asking whether he could represent Palmer before the planning board the next evening.  Ripps explained that the planning board would be considering an application to amend the Bayonne zoning ordinance that would detrimentally affect the value of his property by rendering its use non-conforming.

On February 14, 1989, Ripps attended the planning board meeting accompanied by Feinberg.  When Dugan approached Ripps and asked whether he would object if he, Dugan, represented Bay Bridge on the application that evening, Ripps replied, after consulting with Feinberg, that he would.  At that juncture, another attorney addressed the planning board, first introducing himself as the attorney for Bay Bridge, and then introducing Dugan as a witness.  That attorney informed the planning board that Dugan was a principal in Bay Bridge.  According to Ripps, "I was absolutely shocked.  I had no idea that Dugan was a principal in Bay Bridge."  Ripps testified that the attorney "didn't do much." Instead, Dugan and Bay Bridge's planner spoke at length.  At the end of Bay Bridge's presentation, the planning board denied Feinberg an opportunity to be heard on the basis that two prior hearings had already taken place on the matter.  The planning board instructed Feinberg to submit his objection to the City Council.

At the conclusion of the meeting, the planning board passed a motion that an ordinance for a planned unit development ("PUD") ordinance be accepted and forwarded to the City Council for its adoption.  The Palmer warehouse would have been included in the new PUD district.  Parenthetically, Bay Bridge did not request the planning board to rezone the property as a PUD.  All that

Bay Bridge sought was the rezoning to a residential multi-family district. Instead, the City's engineer's insistence led the planning board to pass the motion to have the area rezoned as a PUD.

Ultimately, the City Council adopted the PUD ordinance but amended it to eliminate all properties not owned by Bay Bridge. Accordingly, the Palmer property was not included in the PUD district. Eventually, the ordinance was declared invalid as a result of litigation instituted by Palmer and others. According to Ripps, Hannoch Weisman continued to represent Palmer in a corporate capacity until April 1989.

### III

■ The DRB found that both Dugan and Berkowitz had violated *RPC* 1.7. *RPC* 1.7 states the rule governing conflicts of interest as follows:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and

(2) each client consents after a full disclosure of the circumstances and consultation with the client ...

(b) A lawyer shall not represent a client if the representation may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after a full disclosure of the circumstances....

As the DRB noted, *RPC* 1.10 applies the conflict of interest responsibilities to members within a law firm:

(a) when lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by *RPC* 1.7....

The DRB correctly observed that the possibility of a conflict was sufficient to warrant the lawyers involved taking appropriate action under the conflicts rules. The fact that Ripps unequivocally expressed to Berkowitz, on December 12, 1988, his extreme concern about the adverse effect of a residential development on his

business was, accordingly, of great significance to the DRB. The DRB correctly surmised that even if Ripps had not specifically requested that Berkowitz oppose the proposed zoning ordinance, nonetheless he obviously had serious objections to the residential development itself because of its deleterious effect on the operation of his business and on the value of his property. The DRB noted that even Berkowitz himself acknowledged that Ripps appeared very concerned about the harmful impact of the development on his business and on his property. Accordingly, the DRB concluded that the possibility of a very serious conflict of interest was apparent as early as December 12, 1988.

> The DRB observed that in avoiding a conflict of interest
> the lawyer must have in mind not only the avoidance of a relation which will obviously and presently involve the duty to contend for one client what his duty to the other presently requires him to oppose, but also the probability or possibility that such a situation will develop. (citing *In re Kamp*, 40 *N.J.* 588, 594 [194 *A.*2d 236] (1963), citing *Henry S. Drinker, Legal Ethics* 104 (1953)).

The DRB further noted that even if Ripps had never requested that Berkowitz represent Palmer in the rezoning matter, a conflict of interest had still existed because Berkowitz had acted as corporate counsel for Palmer at the same time that Dugan had had a personal interest in Bay Bridge when the interests of those two clients had clearly been adverse. The DRB concluded that even if Dugan had withdrawn from his representation of Bay Bridge immediately on discovering that Palmer had objected to the rezoning, Berkowitz could not have continued to represent Palmer as its corporate counsel because of Dugan's personal interest in Bay Bridge.

The DRB also properly determined that Berkowitz's erroneous conclusion, after consultation with another partner in the firm, that no conflict of interest had existed should not exonerate him.

The DRB further found that Dugan had been just as obligated as Berkowitz to make full disclosure of the circumstances of his representation of Bay Bridge and to attempt to obtain Ripps' explicit consent for any continued representation. The DRB, however, found no clear and convincing evidence that Dugan had

knowingly omitted disclosure to Berkowitz and Ripps of his personal stake in the Bay Bridge venture.

## IV

The consequences that attend the decision to discipline an attorney are serious, and we therefore require clear and convincing evidence to sustain a charge of misconduct. *In re Pennica,* 36 *N.J.* 401, 419, 177 *A.*2d 721 (1962). That evidence is present in this case.

■ In December 1988, Berkowitz and Dugan were clearly apprised of facts sufficient to alert them of the probability or possibility of a conflict between Bay Bridge and Palmer. According to Berkowitz and Dugan, no conflict existed under *RPC* 1.7 in December 1988 because Palmer had not yet decided to oppose the zoning change sought by Bay Bridge. That understanding of the rules of conflict is simply wrong. The proximity of Palmer's commercial property to Bay Bridge's proposed development provided a sufficient basis for a potential conflict between the interests of Bay Bridge and those of Palmer. Palmer was then confronted with a decision whether to oppose the proposed development. The necessity to make such a decision itself converted a potential conflict of interests into an *actual* conflict of interests. Moreover, such a decision would have to have been a fully-informed one. Any legal advice regarding the decision of whether to oppose the proposed zoning would obviously create a division of loyalties between respondents and their clients. Thus, Bay Bridge's interests dictated that Palmer should not oppose the zoning ordinance. Hence, Berkowitz could not advise Palmer to oppose the proposed zoning without compromising Hannoch Weisman's loyalty to Bay Bridge. Conversely, Dugan could not act for Bay Bridge to discourage Palmer's opposition to the zoning without undermining Hannoch Weisman's loyalty to Palmer.

■ Berkowitz claims, however, that neither he nor Hannoch Weisman was actually representing Palmer regarding the Bay

Bridge development. Berkowitz's contention on this point involves much too narrow an understanding of what "representation" entails in assessing the application of the ethics governing conflicts. Regardless of whether Berkowitz explicitly said that he would represent Palmer in the matter, his relationship with Palmer as corporate counsel, his indication that he would look into the matter, and Ripps' apparent reliance on his anticipated advice were sufficient to establish an attorney-client relationship. When a client asks corporate counsel to look into a matter affecting the corporation's legal interests, one presumes that the counsel's legal advice on the matter is expected.

We are satisfied that as early as December 1988, at least the potential for conflict should have been obvious to respondents. Respondents were aware of facts that put them on notice that the interests of their clients would be put in jeopardy if they did not act promptly to resolve the apparent conflict. Respondents failed to do so. The attorneys did not make a full disclosure of the conflict as they were clearly obliged to do. Further, both Dugan and Berkowitz misled Ripps by ignoring or minimizing the conflict based on the mistaken notion that no conflict would exist unless Palmer decided actually to oppose the proposed zoning ordinance. However, as already noted, that decision itself required legal advice and guidance that these attorneys could no longer ethically furnish because of their conflicting loyalties. "One of the most basic responsibilities incumbent on a lawyer is the duty of loyalty to his or her clients. From that duty issues the prohibition against representing clients with conflicting interests." *In re Opinion No. 653*, 132 *N.J.* 124, 129, 623 *A.*2d 241 (1993). Respondents violated that duty of loyalty.

Further, we are satisfied that the evidence clearly and convincingly supported a finding that Dugan knowingly failed to disclose to Berkowitz and Ripps his personal stake in Bay Bridge. To that extent we disagree with the DRB. That Berkowitz himself suspected that Dugan might have a personal interest in Bay Bridge and that Dugan was vague or less than candid in informing Ripps

about the status of Bay Bridge's zoning application before the planning board in light of the scheduled public meeting the next night dispel the inference that Dugan's nondisclosure can be attributed to oversight or inadvertence. Further, Dugan's awareness of the significance of his proprietary interest in Bay Bridge is further evidenced by the fact that he was then obviously fully prepared, on the following evening at the planning-board meeting, to testify as a principal of Bay Bridge and to substitute another attorney to represent Bay Bridge. Those circumstances suggest a conscious decision on Dugan's part not to reveal to Ripps or Berkowitz his interest in Bay Bridge. Once Dugan became aware of Ripps' interest and concern about the possible threat that the Bay Bridge proposal might pose to Palmer, Dugan not only should have disclosed the representational conflicts implicating himself and Berkowitz but also should have disclosed his own personal stake in Bay Bridge. In the absence of any disclosure of Dugan's personal interest in Bay Bridge, Ripps could not have made an informed consent to continued representation even if the conflict alone had been revealed.

Dugan's interest in Bay Bridge, under the circumstances, exacerbated the degree of the conflict and underscores the gravity of the overall misconduct. This Court has repeatedly cautioned attorneys about the extreme risks that attend the entanglement of an attorney's own business interests with his or her lawyering. *See, e.g., In re Dato,* 130 *N.J.* 400, 614 *A.*2d 1344 (1992); *In re Silverman,* 113 *N.J.* 193, 549 *A.*2d 1225 (1988); *In re Reiss,* 101 *N.J.* 475, 502 *A.*2d 560 (1986); *In re Wolk,* 82 *N.J.* 326, 413 *A.*2d 317 (1980). Dangers of such entanglement are particularly evident when, as in this case, they affect not only the attorney's own client but also another party whose interests are adversely affected by the attorney's conflicting loyalties. That Dugan had an interest in Bay Bridge made it even more imperative for him to deal forthrightly and expeditiously to overcome the conflict.

The DRB also concluded that the "absence of harm to the client" should serve as a mitigating factor. We disagree with that

conclusion.  Respondents' unethical actions forced Ripps to hire an attorney at the last minute to represent him at the February 14, 1989, planning-board meeting.  The zoning proposal had advanced considerably by that time.  Ripps' attorney doubtless did not have an opportunity properly to prepare for that meeting, and Palmer's interests were, therefore, jeopardized.  Bay Bridge, moreover, retained its distinct advantage in the matter as a result of Dugan's own actions.  Although Dugan agreed at Ripps' insistence not to represent Bay Bridge at the planning-board meeting, he did speak at the meeting as a witness based on his status as a principal in Bay Bridge.  Dugan testified as a proponent of Bay Bridge, acting as a direct adversary to Palmer.  Finally, that the challenged ordinance was ultimately declared invalid as a result of litigation instituted by Palmer and others does not support a conclusion that respondents' conduct caused no harm.  That Palmer had to litigate the validity of the ordinance supports a conclusion that respondents' conduct caused actual harm to Palmer's interests.  Although respondents' conduct was not "evil," it was clearly self-interested and inexcusable.

## V

The primary purpose of discipline is not to punish the offender but to protect the public from members of the bar who fail to meet their professional responsibilities.  *In re Goldstaub*, 90 *N.J.* 1, 5, 446 *A.*2d 1192 (1982).  That goal is consistent with the need to maintain the public's confidence in the integrity of our attorneys. "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances."  *In re Nigohosian*, 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982).

Both Berkowitz and Dugan have repeatedly expressed an overly narrow and self-serving view of the conflicts-of-interest rules. Lawyers are expected to be fully versed in the ethics rules that regulate their conduct.  Ignorance or gross misunderstanding of these rules does not excuse misconduct.  As in *In re Humen*, 123

*N.J.* 289, 299, 586 *A.*2d 237 (1991), respondents' "conduct discloses an entirely unacceptable insensitivity to … basic ethical considerations."

We have generally found that in cases involving a conflict of interest, absent egregious circumstances or serious economic injury to the clients involved, a public reprimand constitutes appropriate discipline. See, *e.g., In re Porro,* 134 *N.J.* 524, 635 *A.*2d 506 (1993); *In re Doig,* 134 *N.J.* 118, 631 *A.*2d 542 (1993); *In re Woeckener,* 119 *N.J.* 273, 574 *A.*2d 991 (1990); *In re Paschon,* 118 *N.J.* 430, 572 *A.*2d 194 (1990). Here, although we find that the breach of ethics was not inconsequential with respect to its adverse effects on Palmer, we are not presented with evidence of substantial injury or economic loss. Under the circumstances, we agree with the DRB's recommendation that public reprimand is sufficient discipline for respondents' unethical conduct.

ORDERED that respondents shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

## ORDER

It is ORDERED that **BERNARD S. BERKOWITZ of ROSE-LAND,** who was admitted to the bar of this State in 1957, is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

## ORDER

It is ORDERED that **JAMES P. DUGAN of NEWARK,** who was admitted to the bar of this State in 1959, is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

For public reprimand—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

Opposed—None.