NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2403-13T4

ELIZABETH A. COMANDO,
individually and derivatively
on behalf of 10 CENTRE DRIVE, LLC,

    Plaintiff-Appellant,

v.

MARY F. NUGIEL[1] and RCP MANAGEMENT
COMPANY,

    Defendants-Respondents,

and

PRIDE CONSTRUCTION SERVICES, LLC,[2]

    Defendant.

---

        Argued May 7, 2014 - Decided June 11, 2014

        Before Judges Lihotz, Maven and Hoffman.

        On appeal from the Superior Court of New
        Jersey, Law Division, Bergen County, Docket
        No. L-5130-13.

---

[1]    The record includes references to defendant Nugiel's former name, Mary Faith Radcliffe, as she married on September 9, 2011.

[2]    Defendant Pride Construction Services is not participating in this appeal.

---

**APPROVED FOR PUBLICATION**

**June 24, 2014**

**APPELLATE DIVISION**

Kevin J. O'Connor argued the cause for appellant (Peckar & Abramson, P.C., attorneys; Mr. O'Connor, on the brief).

Robert J. Feinberg argued the cause for respondents (Giordano, Halleran & Ciesla, P.C., attorneys; David C. Roberts and Michael T. Strouse, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

On our leave granted, plaintiff Elizabeth A. Comando, individually and derivatively on behalf of 10 Centre Drive, LLC (10 Centre), a corporation she owns with defendant Mary F. Nugiel, appeals from a November 22, 2013 interlocutory order, denying her motion to disqualify Norris McLaughlin & Marcus, P.A. (NMM) from providing legal representation to defendants. Plaintiff argues she was a former client, as NMM provided legal representation to her in acquiring and securing financing of real estate. Further, she alleges she was wrongfully denied the right to exercise a promised option to acquire an ownership interest in defendant RCP Management Company (RCP), which maintained its headquarters in 10 Centre's realty. Finally, Comando asserts NMM's current representation of defendants is adverse to the interests of 10 Centre, which is also a current client, noting NMM additionally provided prior representation including preparation of the twenty-year lease agreement between RCP, as tenant, and 10 Centre, as landlord.

Since this matter was argued on May 7, 2014, we issued our opinion in a related appeal that addressed another provision of the same order. Comando v. Nugiel, A-2070-13 (App. Div. May 22, 2014). In that matter, we determined the provisions of the 10 Centre Operating Agreement required a form of alternative dispute resolution once Comando and Nugiel were deadlocked over whether to sell the realty owned by 10 Centre and leased by RCP and defendant Pride Construction Services. Id. at 2.

Thereafter, we received correspondence, issued on behalf of NMM by substituted counsel, advising that "as of May 20, 2014, the Norris McLaughlin & Marcus firm has ceased rendering legal services to the [d]efendants as it relates to this action in its entirety." This materially changed the position NMM previously had taken, as expressed in an email communication from NMM dated March 13, 2014, to Comando's counsel, which advised of substituted counsel undertaking representation, but stated "[NMM] reserve[d] the right to continue to provide legal representation to all of the [d]efendants in this matter, and [NMM is] not representing . . . that [it would] never have another conversation with [Nugiel] about this case, or about other matters."

Defendants maintain that the substitution of counsel coupled with the recent representations that NMM's legal advice

on issues in this litigation has ceased moot Comando's arguments raised on appeal. Comando disagrees and presses her claim of disqualification. She identifies findings by the motion judge, which, she asserts, if not reviewed and reversed, will adversely affect the ongoing litigation. Specifically, Comando argues the judge erroneously found NMM had not provided legal representation to her. She also asserts that despite finding NMM represented 10 Centre, the judge improperly rejected the asserted corporate derivative claims and suggested instead that the complaint alleges individual claims by Comando against Nugiel.

Following our review, we conclude the record is far too limited and contains material factual disputes making this court unable to discern the full extent and nature of NMM's prior legal representation of Comando, which could only have been determined following an evidentiary hearing. The evidence certainly shows NMM provided limited legal services to her and also rendered extensive legal services to 10 Centre, as well as RCP and Nugiel. Moreover, in at least one specific transaction, that is the negotiation of the RCP lease for realty owned by 10 Centre, NMM acted as counsel for the landlord, 10 Centre, and the tenant, RCP. The terms of and parties' compliance with that lease are now at issue. Accordingly, NMM's continued dual

representation of providing legal services to 10 Centre and, up until recently, rendering legal advice to RCP to defend the claims raised in this complaint, raises a conflict prohibited by the Rules of Professional Conduct (RPC). Further, the trial judge erroneously rejected the derivative claims by incorrectly determining the issues raised claims held by Comando individually.

At this juncture, NMM has removed itself from providing legal representation to any party regarding this litigation. However, with respect to the derivative claims advanced by 10 Centre, NMM has a continuing conflict prohibiting its representation of the corporation, while also representing RCP, which must be waived. Regarding Comando's claim of disqualification based on her prior representation, although we conclude the judge inaccurately found NMM provided no legal representation to her, the record does not allow this court to fully assess the extent and nature of that representation. Nevertheless, NMM's complete withdrawal renders the question moot.

I.

These facts are found in the motion record. Comando commenced employment with RCP on March 1, 2004. In exchange for Comando's employment efforts to grow RCP's business, she

received a base salary and additional compensation of one-third of the net profits generated in "the North Region," to which she was assigned. Id. at 3. Comando also understood she would be given the opportunity to obtain an ownership interest in RCP. Ibid. She contends the parties entered into a Client Purchase Option Covenant, setting forth the terms upon which she could purchase the North Region portfolio in the event she or RCP terminated her employment.

In 2009, Comando was promoted to Senior Vice President, and on April 29, 2011, she was named a "Principal" of RCP. Ibid. Comando avers that in the ensuing years she contributed significantly to RCP's expansion in the region and its resulting increases in revenue.

In June 2010, Nugiel retained NMM "to represent RCP in general corporate matters arising from time-to-time." NMM's June 28, 2010 engagement letter, authored by Jesse P. Nash, acknowledged NMM had been retained "to represent [RCP] as an entity" "for the purpose of: reviewing [RCP's] employee manual/handbook and such other legal matters for and/or on behalf of [RCP] as may arise from time[-]to[-]time." The letter urged "any shareholder, director, member, partner or officer" with legal questions regarding particular rights or obligations to obtain separate counsel. Nash's letter concluded: "We will

not represent the interests of any one individual in any way that is in conflict with the interests of the entity as a whole."

In early 2011, Comando and Nugiel formed 10 Centre as a holding company to acquire and manage real property that would become RCP's headquarters. According to Nash, Nugiel requested he and NMM provide legal representation in "(1) the formation of the limited liability company, (2) preparation of the RCP lease for the property, (3) preparation of an operating agreement for [10 Centre], and (4) [assistance] with legal issues surrounding obtaining the financing needed by [10 Centre] to purchase the new headquarters" for RCP. There is no mention of the preparation or existence of a new engagement letter for these new legal services and nothing to explain what role Comando had in engaging NMM.

NMM incorporated 10 Centre and served as its registered agent. In preparation of 10 Centre's operating agreement, Nash acknowledged he conducted conference calls with Nugiel and Comando, summarized provisions of the drafted documents, and emailed a memo to both Nugiel and Comando regarding modifications of the agreement terms.

Nash also assisted with the preparation, modification and execution of an "agreement for purchase and sale" of the realty

ultimately acquired by 10 Centre. In the purchase of the realty, Nash assisted with the preparation, review and execution of several agreements related to the intricate multi-million dollar acquisition and the financing and re-financing of a bridge loan. It is unclear whether he provided individual legal advice to Nugiel regarding this transaction, while also acting as 10 Centre's counsel. Nash also drafted a lease agreement allowing RCP to lease the property acquired by 10 Centre for twenty years at a flat rent.

In this regard, Nash insists he took direction from Nugiel and "never gave [] Comando any personal advice or counsel on those issues." This assertion contradicts his claim of serving as counsel for the corporation not its members and also his written representations contained in an opinion letter delivered to TD Bank in respect of the highly complex financing arrangement. In issuing his legal opinion, Nash stated NMM

> acted as special counsel to 10 Centre Drive, LLC (the "Borrower"), RCP Management Company, Inc. (the "Equity Guarantor") and Mary Faith Radcliffe and Elizabeth Comando (each, an "Individual Guarantor" and collectively, the "Individual Guarantors") in connection with the closing . . . of a $1,500,000 mortgage loan from you to Borrower (the "First Mortgage Loan") and a $350,000 bridge loan from you to Borrower (the "Bridge Loan, and together with the First Mortgage Loan, the "Loan Facilities").

NMM maintains the opinion letter does not evince legal representation was provided to Comando. Nash alleges he fully informed Comando he was not her lawyer, as reflected in his memo accompanying transmittal of 10 Centre's proposed operating agreement, in which he stated:

> As an initial matter (and as you both know) I must stress that I represent [Nugiel] and RCP [] in several matters. I have drafted the attached based on your instructions, but I do not represent [Comando] in connection with these matters. [Comando], this operating agreement is a complicated document, I advise you to obtain separate counsel to advise you and advocate for your interests in connection with the attached. Review of this cover note is not a substitute for a careful review of the attached with your own counsel. Please let me know if you would like me to refer an attorney to you.
>
> . . . .
>
> I have received a lot of feedback from you both, and I attempted to harmonize all of this feedback into a single set of terms, but this was not always possible.

Nash certified that at the time he sent this document, Comando "clearly communicated to [him] that she understood and acknowledged the fact that [Nash] was not acting as her counsel in connection with the subject series of transactions." Nugiel also certified to her recollection of Nash's statements in an unspecified phone conference that Comando "was not represented

by NMM in connection with the formation of 10 Centre[], or preparation of its operating agreement."

Comando disputes Nash's assertions of limited involvement on her behalf. She maintains she and Nugiel were "sitting at the table" with Nash "when 10 Centre was formed and the lease was negotiated and filed." On or about July 5, 2011, Nash, Nugiel and Comando discussed the initial draft of the operating agreement and its terms during a conference call. In an e-mail dated July 6, 2011, Nash sent the updated version to both Nugiel and Comando, requesting they review the document and provide him with any further comments. Comando sent Nash her personal financial statement to be used when negotiating the mortgage and requested he keep the documents confidential. Further, she relied on NMM's July 19, 2011 opinion letter to TD Bank, including several representations that applied to her. Among these were the loan documents "constituted a legal, valid and binding obligation of each [o]bligor" and that the execution of the document "by each [o]bligor . . . d[id] not violate . . . any applicable judgment, order, writ, injunction or decree known to [NMM] of any court or other governmental authority." Comando also supplied a September 14, 2011 email sent regarding an SBA loan for 10 Centre, in which she identified Nash as her counsel.

Nugiel and Comando's relationship deteriorated. Comando alleges difficulties and disagreements arose between Comando and Nugiel regarding RCP's finances and Nugiel's absence from the office. Comando resigned from RCP on April 1, 2013. She thereafter initiated this litigation.

By letter dated June 18, 2013, Comando's counsel expressed his position "[Nash] and [NMM] are conflict[ed] from representing any party in relation to these disputes[.]" She thereafter moved for NMM's disqualification, alleging violations of RPCs 1.7, 1.9 and 3.7. Following argument, the motion judge rejected Comando's assertions, finding she "never sought or received any legal advice from [NMM] in connection with the issuance of the opinion letter" to TD Bank and emphasized Comando was "advised repeatedly throughout the process of [10 Centre's] formation and financing that she was [not] [sic] represented by [NMM] and that she should retain her own attorney." The judge also rejected Comando's asserted derivative claims on behalf 10 Centre, concluding they were direct claims by Comando against Nugiel because Comando and Nugiel were 10 Centre's sole shareholders.

Comando moved for interlocutory review. We granted leave to allow consideration of the request for disqualification. While the matter was pending, Comando moved to supplement the

record stating documents finally released by defendants in compliance with discovery demands supported her request to reverse the trial court's order. She attached emails reflecting NMM billing statements sent to her and Nugiel for fees rendered for the real estate matter, including RCP's lease, billed to 10 Centre for payment; NMM trust account ledgers showing monies paid by Comando and 10 Centre apparently for legal services rendered to RCP; emails discussing substantive provisions of the financial documents, including the need to execute a release and Nash's opinion about doing so; correspondence from NMM to third parties confirming its representation of 10 Centre; and emails from Nash to Comando discussing 10 Centre's tax appeals.

Defendant opposed the motion as moot and, alternatively, cross-moved to supplement the record with the email from Nash stating NMM was no longer trial counsel for defendants in the litigation. The email also advised NMM "reserve[d] the right to continue to provide legal representation to all of the [d]efendants in this matter, and [NMM was] not representing . . . that [it would] never have another conversation with [Nugiel] about this case, or about other matters."[3]

---

[3] The inclusion of references to these materials signals our decision to grant the motion and cross-motion to supplement the record.

II.

The review of a motion for disqualification requires a court "to balance competing interests, weighing the 'need to maintain the highest standards of the profession' against 'a client's right to freely choose his [or her] counsel.'" Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988) (quoting Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978)). "[A] person's right to retain counsel of his or her choice is limited in that 'there is no right to demand to be represented by an attorney disqualified because of an ethical requirement.'" Ibid. (quoting Reardon v. Marlayne, Inc., 83 N.J. 460, 477 (1980)). Our review of "an order granting or denying a disqualification motion invokes . . . de novo plenary review . . . ." Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 274 (2012).

Comando identifies several bases to support disqualification. We start with her argument that NMM's ongoing representation of 10 Centre precluded its representation of RCP in any adverse transaction. RPC 1.7 addresses concurrent conflicts of interests and provides in pertinent part:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation. . . . When the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;

(2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(3) the representation is not prohibited by law; and

(4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

This rule is easily applied in the context of litigation. See Kevin H. Michels, New Jersey Attorney Ethics — The Law of New Jersey Lawyering, § 19:2-1 at 407 (2012) ("RPC 1.7(a)(1) clearly prohibits the representation of opposing parties in the

same litigation."). See also N.J. Advisory Comm. on Professional Ethics Op. 362 (1977) (holding a lawyer representing both a union and an individual member of that union had to withdraw from representation of both clients upon the individual's filing a grievance against the union). We conclude the rule's proscriptions must equally apply to transactional matters, and a concurrent conflict of interest arises when "the representation of one client will be directly adverse to another client." RPC 1.7(a)(1).

"RPC 1.7 is rooted in the concept that '[n]o man can serve two masters,' Raymond L. Wise, Legal Ethics 272-73 (1970), and, it has been suggested that employment should be declined if there is a question whether the representation will create an adversity of interest between two clients." State ex rel. S.G., 175 N.J. 132, 139 (2003). This principle applies here.

### A.

Focusing on the corporate entities, NMM is counsel to RCP and 10 Centre. There is no engagement letter explaining NMM's role regarding 10 Centre or authorizing the firm to take direction from Nugiel when acting on behalf of 10 Centre. The twenty-year lease presents adverse interests between Nugiel and RCP on one hand, and 10 Centre on the other, because lease terms favorable to RCP may well be detrimental to 10 Centre. There

was no evidence of a waiver by all clients when preparing the lease between 10 Centre and RCP, which would include Comando who was a fifty percent member of 10 Centre. See In re Dolan, 76 N.J. 1, 11, 13 (1978) (finding representation of a mortgagor and mortgagee in a transaction is a direct conflict of interest requiring informed consent of the clients, particularly in light of "the possibility that as between buyer and developer-seller there may ripen some disagreement respecting the physical condition of the premises").

Further, the documents submitted strongly suggest Nash took direction only from Nugiel on these matters, but she was one of the two equal members of 10 Centre. The complaint challenges Nugiel's actions as detrimental to the interest of 10 Centre and as favoring those of RCP. It also asserts the rent paid by RCP was not based on fair market value, a claim that appears to strike at the heart of the potential conflict of interest and implicates financial detriment to 10 Centre which has significant debt service that must be met. See Michels, supra, § 19:3-1 at 440 ("RPC 1.7(a)(2) may be implicated when a lawyer proposes to represent two or more persons with an interest in the same object, occurrence, or transaction.").

Also, allegations such as minority shareholder oppression, wrongful disposition of excess funds received by 10 Centre in

the SBA loan closing, and diversion of profits based on Nugiel's refusal to release the details of 10 Centre's financial affairs, are problematic to NMM which purports to currently represent 10 Centre, as well as RCP and Nugiel.[4] "RPC 1.7 reflects 'the fundamental understanding that an attorney will give complete and undivided loyalty to the client [and] should be able to advise the client in such a way as to protect the client's interests, utilizing his professional training, ability and judgment to the utmost.'" J.G. Ries & Sons, Inc. v. Spectraserv, Inc., 384 N.J. Super. 216, 223 (App. Div. 2006) (alteration in original) (quoting State ex rel. S.G., supra, 175 N.J. at 139).

Prior to its recent withdrawal from all representation, NMM's role in this litigation as counsel for Nugiel and RCP against Comando and 10 Centre presented prima facie evidence of a concurrent conflict of interest, waivable only by informed written consent, which has never been presented. RPC 1.7(b)(1). Further, NMM's continued representation of 10 Centre in a transactional capacity will not diminish the adverseness between RCP and 10 Centre. Nugiel, in her corporate capacity as a member of 10 Centre, is alleged to have wrongfully controlled 10

---

[4]    NMM currently provides legal representation to 10 Centre in its general business affairs, is involved in pending tax appeals, and acts as its registered agent.

Centre's financial affairs to aid RCP and harm 10 Centre. NMM's legal representation of Nugiel and RCP impinges upon its allegiance to protect 10 Centre's interests raising "a significant risk that the representation of one or more clients [would] be materially limited by the lawyer's responsibilities to another client." NMM's loyalty to Nugiel and RCP prefers their interest to the competing interests of 10 Centre. This may not continue. RPC 1.7(a)(2).

The motion judge's characterization of the derivative claims as a "red herring" is erroneous. He failed to analyze the claims and their impact on 10 Centre, as well as its creditors. The complaint asserts Nugiel breached her fiduciary duty in carrying out her responsibilities as "an officer, director and/or shareholder of . . . 10 Centre []," which resulted in the failure to further the interests of 10 Centre in favor of RCP; the improper management and operation of the corporation and its finances; and the improper diversion of funds away from 10 Centre "for personal and/or non-business purposes." The action by Nugiel on behalf of 10 Centre, if proven, would reveal actual harm done to the corporation, impinging its ability to operate and satisfy its debts.

We reject as unpersuasive defendants' analogy between the facts at hand and those in Kira Inc. v. All Star Maint. Inc.,

267 Fed. App'x 352 (5th Cir. 2008). There, in concluding no conflict of interest arose in rendering legal services to the parties, the court relied directly on the jury verdict rejecting as meritless the plaintiff's underlying claims. Id. at 356. We cannot do the same in this newly commenced matter.

More apt to these facts is the Court's holding in In re Berkowitz, 136 N.J. 134 (1994). In that matter, an attorney represented a client seeking a zoning variance on land contiguous to the property of a client represented by another attorney at the firm. Id. at 135-36. The second client would be adversely affected if the first client's application were granted. Id. at 135. The Court reprimanded both attorneys, who it found failed to fully disclose the potential conflict to the clients, noting "the decision of whether to oppose the proposed zoning would obviously create a division of loyalties between [the attorneys] and their clients." Id. at 144.

We conclude the motion judge erred in rejecting Comando's derivative claims on behalf of 10 Centre, without even considering the need for further development of the facts and circumstances surrounding her assertions, along with the nature of NMM's actual representation of these clients. Further, NMM's ongoing representation of Nugiel individually, RCP and 10 Centre

on a transactional basis presents a concurrent conflict in contravention of RPC 1.7(a).

### B.

The record is less clear on the claims of conflict asserted by Comando individually. Contrary to the motion judge's statement, NMM provided at least limited representation to Comando in the course of the loan transactions. NMM does not dispute it represented itself to the lenders as Comando's counsel for the purpose of effectuating the closing of the identified loans. NMM's attempts to minimize the facts regarding this representation are rejected. By their nature, opinion letters are instruments of negotiation "made to induce reliance," such that the law recognizes a duty owed to third persons in preparing such documents. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005). See also Petrillo v. Bachenberg, 139 N.J. 472, 485 (1985).

"[I]f the prior and the subsequent matters are indeed the same, the representation, absent written consent of the former client, is prohibited." Twenty-First Century Rail Corp., supra, 210 N.J. at 276 (holding RPC 1.9(a) prohibited representation where an opinion letter reflected counsel's awareness of the adverseness of the current and former clients' positions in the same dispute). Comando as a former client bears the burden of

production of showing "that by application of RPC 1.9 [she] previously had been represented by the attorney whose disqualification is sought." City of Atl. City v. Trupos, 201 N.J. 447, 462 (2010). If she successfully provides necessary proofs, "the burden shifts to the attorney(s) sought to be disqualified to demonstrate that the matter . . . in which he or [she or] they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought." Id. at 463.

However, the record is insufficient to determine whether that prior representation created a present conflict of interest, proscribed by RPC 1.9(a).[5] The filed certifications do not provide conclusive documentation, but rely on oral representations, which are disputed. Further, the record as presented cannot support a determination that the prior representation was sufficiently related to the current disputes.

---

[5] RPC 1.9(a) provides:

> A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

See Trupos, supra, 201 N.J. at 467 (holding RPC 1.9(a) bars representation of a client against a former client where "facts relevant to the prior representation are both relevant and material to the subsequent representation"). Perhaps an evidentiary hearing could have fleshed out the competing oral assertions and determined the extent of the attorney-client relationship, but we conclude that such an effort is no longer necessary. Although we reject as unsupported the trial judge's finding that no representation was provided to Comando by NMM, in light of NMM's current withdrawal, the issue is moot.

"Mootness is a threshold justiciability determination rooted in the notion that judicial power is to be exercised only when a party is immediately threatened with harm." Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311 (App. Div. 2010) (citation omitted). "'A case is technically moot when the original issue presented has been resolved, at least concerning the parties who initiated the litigation.'" Ibid. (quoting DeVesa v. Dorsey, 134 N.J. 420, 428 (1993) (Pollock, J., concurring) (citation omitted)). In other words, "[a]n issue is 'moot' when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy." Greenfield v. N.J. Dep't of Corrs., 382 N.J. Super. 254, 257-58

(App. Div. 2006) (internal quotation marks and citation omitted).

## C.

Comando also contends NMM should be disqualified because Nash could be called to testify at an ensuing trial.[6] Even though it is unclear how Nash's testimony supports or refutes the remaining claims, this too is moot.[7]

## III.

In summary, the motion judge's order denying the motion for disqualification regarding 10 Centre's derivative claims was grounded on erroneous legal conclusions. The conflict between 10 Centre and RCP may continue depending on NMM's continued

_____

[6]     Under RPC 3.7(a):

> [a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

[7]     Defendants argue Comando's delay in moving for NMM's disqualification is a waiver. The facts refute this claim. We will not provide an extended discussion of the issue because defendants did not file a cross-appeal.

representation of these entities and Nugiel. Disqualification based on Comando's claim of past representation is moot as is the assertion Nash may be a necessary witness at trial. These claims are dismissed.

Dismissed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION