# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4993-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

N.S.,

      Defendant,

and

D.E.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF P.E.,

      a Minor.

_____

      Argued telephonically June 3, 2020 —
      Decided June 25, 2020

      Before Judges Koblitz, Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0064-19.

Anastasia P. Winslow, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Anastasia P. Winslow, on the briefs).

Karen Louise Cavalier, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Karen Louise Cavalier, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, on the brief).

PER CURIAM

D.E.[1], the father of twelve-year-old P.E., appeals from a June 28, 2019 judgment terminating his parental rights following a three-day trial. We affirm.

The Division of Child Protection and Permanency (Division) received its first referral involving this family in January 2011, just prior to P.E.'s third birthday, alleging she and another child were spotted walking barefoot on public streets in North Bergen. The police reported the children's paternal grandfather

---

[1] We utilize initials pursuant to Rule 1:38-3(d)(12).

arrived on scene and stated he left the children in the care of an adult relative. In August 2011, the Division received a second referral alleging P.E. was abused, but determined the allegations were unfounded.

In September 2017, police arrested D.E. and charged him with child endangerment of his girlfriend's daughter due to drugs found in their car in the presence of the child. Although P.E. was not involved in the September incident, the Division learned she was present when D.E. was arrested for narcotics possession on two separate occasions in 2017.

In October 2017, the Division received a referral from Newark police that P.E. was found after 1:00 a.m., in the rain, dirty, in urine-soaked clothes with two women identified as her aunt and an adult cousin, who were arrested on outstanding warrants and suspected of prostitution. P.E.'s paternal grandmother arrived at the police station and stated she and P.E. lived in a hotel where she had cared for P.E. since birth, and that she left P.E. in the care of the two women that night. Division caseworkers suspected the grandmother was under the influence due to her behavior and slurred speech. D.E. and N.S., the child's mother, were incarcerated at the time. As a result, the Division conducted an emergency removal, and after a one-night temporary placement, P.E. was moved to her current resource home where she remains to date.

A-4993-18T3

Following the removal, the Division interviewed P.E., who stated that when she was in D.E.'s custody, she received only one meal per day, typically fast-food meals, which she consumed at 1:00 a.m. P.E. stated she was present when D.E. used illicit substances. Although P.E. was ten years old at the time of her removal, she did not know how to write her name and lacked basic academic skills for a child her age. P.E. stated she was homeschooled and could not remember the last time she saw a doctor.

The Division provided visitation to D.E. throughout this matter. However, D.E. insisted on speaking with P.E. in their Romani language, which frustrated the Division's ability to supervise visitation and made P.E. uncomfortable. Over time, P.E. began to resist visitation because D.E. would say upsetting things to her. The adverse effects of P.E.'s contact with her father were manifested in the resource home, where following visitation she exhibited aggressive behavior with the family pets and the resource parents.

In June 2018, the Division completed a psychological evaluation of D.E. recommending he complete a substance abuse assessment upon his release from incarceration; participate in a neuropsychological evaluation; and secure stable housing and employment. In September 2018, D.E. was released, and through drug court, entered into an in-patient drug rehabilitation program.

A-4993-18T3

In October 2018, the Division arranged for a neuropsychological evaluation which recommended D.E.: (1) receive intensive parenting training; (2) participate in individual or group therapy sessions to address stressors associated with parenting; (3) participate in a support program or community care program to help him with adaptive functioning, money-management, and vocational training; and (4) have substance abuse counseling.

Although the Division continued supervised visitation during D.E.'s in-patient drug treatment, the visits ceased when the treatment provider informed the Division that D.E. left treatment prior to completing the program. D.E.'s whereabouts remained unknown until December 2018, when he called the Division to report he was in Florida to help a relative run his business.

The Division filed its guardianship complaint in December 2018.[2] The court entered an order for therapeutic or supervised visitation to begin on a self-executing basis as P.E.'s therapist recommended. The Division also explored potential relative resource placements as an alternative to adoption. It assessed a paternal relative and the paternal grandparents. The Division had difficulty reaching the relative and when it did, she stated she could not care for P.E. The paternal grandmother was ruled out because she failed to keep in contact with

---

[2] N.S. executed a voluntary surrender prior to trial.

A-4993-18T3

the Division and had no stable housing. She provided the names of two other relatives who refused to step forward as caregivers. The paternal grandfather expressed an interest in caring for the child, but neither followed up, nor provided the Division with an address to complete its assessment. The Division also assessed a maternal aunt who changed her mind, and assessed and ruled out both maternal grandparents.

In December 2018, D.E. was arrested on outstanding warrants, charged with child endangerment, and incarcerated again. In February 2019, he was released to a drug treatment facility as a part of drug court. In March 2019, the Division arranged for comparative bonding evaluations, however its expert terminated D.E.'s bonding evaluation because D.E. took the opportunity to ask P.E. inappropriate case-related questions causing the child to end the evaluation because she was afraid of her father. The Division's expert interviewed the child alone who stated she did not want to see D.E. The expert concluded P.E. had a "trauma bond" with D.E.; while she viewed him as her father, she did not see him as nurturing.

The child's bonding evaluation with the resource parents contrasted greatly. The expert concluded that P.E. had a positive bond with both resource parents. The child was relaxed, self-assured, engaged in play, and interacted

"seamlessly" with her resource parents. P.E. saw both resource parents as nurturing and wanted to be adopted.

On the first day of trial D.E.'s assigned attorney requested an adjournment and to be relieved so D.E. could retain private counsel. Counsel represented that D.E.'s parents would give him the funds to retain new counsel with whom he had an appointment the following day. The Division and the Law Guardian objected to the delay in permanency caused by an adjournment to speak to new counsel. The trial judge questioned D.E. under oath to ascertain his reasons for seeking new counsel. D.E. stated he could now afford to hire an attorney and wished to do so because his assigned counsel repeatedly told D.E. it was D.E.'s fault P.E. was removed.

The trial judge denied D.E.'s request. He noted D.E.'s assigned counsel was involved in the case for over a year, and

> [s]eventeen months later, after many court proceedings . . . case management conference[s] . . . and preparation for trial, at the last minute [D.E.] wants a private attorney for no other reason that he believes a private attorney would serve him better than a public attorney. That's not a sufficient reason because I will note that the Office of the Public Defender and its lawyers are professional, well-trained, very thorough litigators and are as able as anyone else to represent a defendant. In . . . many cases they are more able than many private attorneys who might be received.

A-4993-18T3

Number two . . . this trial has already begun and [D.E.] is going to meet with a lawyer for the first time tomorrow, suggested by someone else. And whether or not he retains that lawyer is questionable because he may not believe that that lawyer, herself or himself, is able to provide the services he needs.

It will inevitably delay the . . . trial and . . . permanency. In fact, this case would probably have to be sent back to an FN . . . at this juncture because this attorney would need to bring himself up to speed in a short period of time for [eighteen] months['] worth of proceedings.

Trial proceeded with assigned counsel. The Division called the adoption worker who testified to the Division's records and its efforts at reunification, and the clinical psychologist who performed the bonding evaluations. The judge found both witnesses' testimony credible and consistent with the evidence. D.E. argued that the Division misunderstood his Romani heritage and culture, in which families travel and extended family members care for the children who are home-schooled. D.E. called his licensed alcohol and drug counselor from the second treatment facility D.E. attended, who testified to the strides D.E. made towards sobriety. The judge found the counselor's testimony credible, but not determinative of the issues before the court.

The trial judge concluded that the Division proved all four prongs of the best interests test pursuant to N.J.S.A. 30:4C-15.1(a)(1)-(4) by clear and

A-4993-18T3

convincing evidence. He found the Division established D.E. harmed P.E. by leaving her in the care of others and "his persistent substance abuse, criminal activity, not giving [P.E.] a meaningful education, and the resulting neglect of [P.E.], which led to her being removed from [his] care has endangered [P.E.]'s safety, health, and development." Notably, the judge addressed D.E.'s assertion the Division viewed the traditions of the Romani culture as grounds for neglect. He stated:

> [C]ounsel for [D.E.], in carrying out his ethical and professional responsibilities, has carefully briefed the . . . Roma background of . . . [D.E.] . . . and that the [c]ourt should not in any way take [D.E.]'s traveling, his sometime separation from [P.E.], his leaving [P.E.] with the care of his . . . aunt and other relatives as being anything other than normal in the Roma culture and would not have any impact on [P.E.]
>
> I agree . . .
>
> . . . And I do not find that anything related to the [Roma] culture has in any way . . . negatively [impacted] on the development of [P.E.] In fact, in most respects it probably has enabled her to be a nurtured child.

However,

> [P.E.] was left mostly to others, not because it's part of the Roma culture. . . .
>
> [Rather], when [D.E.] because of his antisocial behavior and drug abuse is absent for periods of time not because he's traveling, but because he is

A-4993-18T3

incarcerated or otherwise under the influence of drugs which prevents him from nurturing or being the custodian of [P.E.], that constitutes neglect and that is the reason why [the Division] proved by clear and convincing evidence that [P.E.]'s safety and health has been endangered. While she was neglected by [D.E.], she did not receive a proper education, contrary to [D.E.]'s presentation to [the Division's psychologist] that she had been . . . home schooled . . . although he couldn't say when or who home schooled her or what the program was.

The trial judge concluded the Division met the second prong of the best interests test finding D.E. was incapable of providing P.E. a stable home due to his "repeated absences, his drug abuse, his criminal activity over the period of years that he's been the father of [P.E.] has prevented him from nurturing her." The judge concluded,

there's absolutely no indication when [D.E.] could be in a position to parent [P.E.] He needs counseling . . . in drug abuse, anger [management]. According to the . . . defense's own witness, . . . he is moving along, but still needs substantial treatment to overcome his drug abuse.

In this case . . . [D.E.] in his bonding evaluation with . . . [P.E.], treated her so badly that she was afraid to even let him know that she doesn't want to be with him.

. . . .

I find that in addition to what I have said earlier on prong two, that by conducting himself in the manner in which he did at the time of his bonding evaluation,

he has inflicted such severe harm and psychological trauma on [P.E.] that the State has proven by . . . clear and convincing evidence that he is incapable . . . [to] ceas[e] causing the child harm before any delay in permanent placement becomes a harm in and of itself. He has not only not complied with services to provide him with parenting skills, but he has also fought . . . and interfered with Division personnel [and] [the Division psychologist], in trying to convince him to cease his . . . verbal abuse of his daughter.

In addition to visitation and the exploration of relative resource placements, the trial judge found the Division met its reasonable efforts obligation under the third prong of the best interests test by

continuously arrang[ing] for services to help [D.E.] overcome the main obstacle to stability, his addiction. The Division . . . has provided for psychological treatment, . . . provided him with ability to go for services for his substance abuse, . . . the ability to go for substance [abuse] treatment through the Department of Corrections during his incarceration and that the only reason that . . . the Division could not provide extensive services for his rehabilitation from his drug abuse and his antisocial behavior is that he has been incarcerated. . . . [I]n one instance, in November through December, he absconded from the state, left [treatment], contrary to the provisions of his drug court and he was remanded to the . . . correctional facility.

So[,] I find that he has prevented the State from providing him any services and that the Division was at all times willing and able to do so. The . . . reason that . . . these efforts did not bear fruit has nothing to do with the Division's efforts. They were willing and able to do whatever they could to help him. It's . . .

11

simply because they did not bear fruit because of his irresponsibility.

The trial judge concluded the fourth best interests prong was met because the Division's expert testimony proved P.E. had a "strong and seamless" bond with her resource parents who could mitigate the temporary harm she might suffer from the severance of the parental relationship with D.E.  The judge found P.E. had not significantly bonded with D.E. with whom she had "a bond built on . . . fear of . . . provoking [D.E.'s] anger, which [the Division's expert found] corroborated when he . . . interviewed [P.E.]"  He stated:

> [The Division's expert] credibly concluded that . . . by granting [termination of parental rights P.E.] would be able to eliminate the [basis] of her fears, thereby, reducing the harm that she has suffered and she would then be able to begin to reduce her anxiety and recover from the harm inflicted upon her by the neglect of [D.E.]
>
> . . . .
>
> On the other hand, if [a termination of parental rights] was denied and she was removed from her resource parents, [P.E.] would . . . be severely traumatized, [and] suffer severe harm, which could lead to long-term psychological problems in [P.E.]'s future. [D.E.] . . . could not in any way mitigate such severe harm.

12

## I.

D.E. argues the trial judge denied him the right to counsel of his choosing and did not inquire about the length of the adjournment he would require for new counsel to enter the case. He notes he made no prior adjournment requests and claims he had good reason to substitute his counsel because he had a poor relationship with his attorney who was also inexperienced. He claims he had good reason to substitute his counsel because he had a poor relationship with his attorney who was also inexperienced. D.E. also claims the judge violated his privilege against self-incrimination and violated attorney-client privilege by compelling him to testify to explain why he wanted to jettison counsel.

We review a trial judge's denial of an adjournment request under an abuse of discretion standard. State v. Furguson, 198 N.J. Super. 395, 402 (App. Div. 1985). A parents' constitutional right to counsel in a termination of parental rights proceeding derives from Article I, paragraph 1, of the New Jersey Constitution, as well as Title 30. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 305-06 (2007). N.J.S.A. 30:4C-15.4(a) guarantees the statutory right to counsel in such cases. "'An essential element of the constitutional right to the assistance of counsel is the right of a defendant to secure counsel of his

13

own choice.'" Div. of Youth & Family Servs. v. V.J., 386 N.J. Super. 71, 76 (Ch. Div. 2004) (quoting Furguson, 198 N.J. Super. at 401).

"However, the right to counsel of one's choice is not absolute[, and] a trial court retains 'wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar.'" State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012) (quoting U.S. v. Gonzalez–Lopez, 548 U.S 140, 152 (2006)). "Given the impact of a trial delay or interruption on a child awaiting permanency, Family Part judges conducting termination of parental rights proceedings must be mindful of the need for prompt determination of the difficult issues before them." N.J. Div. of Youth & Family Servs. v. R.L.M., 236 N.J. 123, 146-47 (2018). The right to retain counsel of one's own choice "cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice and deprive such courts of the exercise of their inherent powers to control the same." Furguson, 198 N.J. Super. at 401 (internal citations and quotation omitted). "[T]he availability of 'other competent counsel' . . . is no substitute by itself for the constitutional right to choose counsel." Kates, 426 N.J. Super. at 46; see also Ferguson, 198 N.J. Super. at 402. (setting forth a nine-factor balancing test to determine whether trial should be delayed in order to engage new counsel).

A-4993-18T3

We discern no abuse of discretion in the trial judge's denial of D.E.'s last-minute request to delay trial to pursue private counsel. The judge correctly balanced P.E.'s best interests and right to permanency against D.E.'s right to counsel of his choice. The judge found D.E.'s counsel was appointed seventeen months prior to trial and represented D.E. in several court proceedings, and D.E. requested a private attorney "for no other reason that he believes a private attorney would serve him better." The judge observed D.E.'s counsel was experienced and noted D.E. had not yet met or retained another lawyer, and any new attorney would require time to familiarize themselves with the case.

Under these circumstances, the trial judge's refusal to adjourn the trial was a proper exercise of discretion. We decline to address D.E.'s remaining arguments on this issue because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We also reject D.E.'s assertion he was compelled to testify on the choice of counsel issue in violation of his constitutional rights. "[T]he Fifth Amendment is violated when a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered." E.S. v. H.A., 451 N.J. Super. 374, 385 (App. Div. 2017) (internal quotation marks omitted). Coercion arises when a defendant is required "to choose between his or her Fifth

15

Amendment privilege and another important interest because such choices are deemed to be inherently coercive." Ibid. (citing State v. P.Z., 152 N.J. 86, 106 (1997)).

D.E.'s attorney asked him why he wanted to retain private counsel, and the trial judge asked if he was dissatisfied with his attorney's services. This testimony was helpful for the judge to make his findings on the reasonableness of D.E.'s request for an adjournment.

"The attorney-client privilege generally applies to communications (1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made in confidence, (4) by the client." Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013) (emphasis added) (citation omitted). D.E. testified he wanted new counsel by explaining what his attorney allegedly said regarding D.E.'s prospects at trial, not what D.E. told his attorney. Therefore, the attorney-client privilege was not breached.

## II.

D.E. asserts the Division did not prove the four best interests prongs by clear and convincing evidence. He argues prong one was not met because there was no evidence he harmed P.E. by engaging in criminal activity and had

addressed his problems in drug treatment. He asserts prong two was not established because he completed drug treatment, had a job, and a residence. He argues prong three was not met because his incarceration did not obviate the Division's obligation to provide services to him while he was in jail and the judge did not consider kinship legal guardianship (KLG) as an alternative to the termination of parental rights. He asserts prong four was not established as the bonding expert's opinion was unreliable because he spent little time with D.E. and P.E. and relied on Division records to conclude there was a lack of a bond.

"A parent's right to a relationship with his or her child is constitutionally protected," but that right is "not absolute." In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999). "The constitutional protection surrounding family rights is tempered by the State's parens patriae responsibility to protect the welfare of children. The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." Id. at 347 (citation omitted). Permanency for the child is favored over protracted efforts at reunification. See N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012).

In striking a balance between a parent's constitutional rights and a child's fundamental needs, courts employ the four-part test articulated in N.J. Div. of

Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11, and codified in N.J.S.A. 30:4C-15.1(a). In reviewing the trial judge's application of the best interests factors, we must defer to his factual findings unless they "'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citation omitted). So long as "they are 'supported by adequate, substantial and credible evidence,'" a trial judge's factual findings will not be disturbed on appeal. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (citation omitted).

Adequate, substantial, and credible evidence in the record supports the trial judge's findings on all four prongs. The parental relationship harmed P.E. because D.E.'s substance abuse and criminality prevented him from caring for her, regardless of whether he was incarcerated. Indeed, under prong one, N.J.S.A. 30:4C- 15.1(a)(1), harm is not limited to physical abuse or neglect. In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1997). "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999) (quoting K.H.O., 161 N.J. at 352-54). The lack of a permanent, safe, and stable home is also a harm for

purposes of the first prong. Id. at 383. The harm P.E. suffered was material, educational, nutritional, and psychological.

Under the second prong, the Division must show harm to the child "continue[s] because the parent is unable or unwilling to overcome or remove [it]." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506-07 (2004) (alterations in original). Another consideration is whether a delay in permanency will cause further harm to the child. N.J.S.A. 30:4C-15.1(a)(2). "Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child." P.P., 180 N.J. at 506. Prong two functions in tandem with the first, and evidence supporting either of the first two prongs "informs and may support the other." DMH, 161 N.J. at 378- 79. The analysis centers on parental actions "to maintain the parent-child relationship and to foster an environment leading to normal child development." K.H.O., 161 N.J. at 352.

Despite testimony from D.E.'s alcohol and drug counselor regarding D.E.'s limited progress in treatment, the evidence did not support either D.E.'s ability to eliminate the harm to P.E. or that further delaying permanency for her was in her best interests. D.E. did not demonstrate he could ameliorate the "trauma bond" he had with P.E. and as the trial judge noted there is "absolutely

no indication when [D.E.] could be in a position to parent [P.E.]"  As we have held, "[k]eeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law."  N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) (citation omitted).  The trial judge properly weighed the evidence under this prong and we decline to disturb his findings.

The judge's findings that the Division proved the third prong are equally compelling.  This prong requires the Division to make reasonable efforts to assist the parent in maintaining or regaining custody of a child placed at risk by the parent, and whether the court considered alternatives to termination. N.J.S.A. 30:4C-15.1(a)(3).  When D.E. could be located, and regardless of his incarceration, the Division afforded him visitation and a battery of services to address his addiction and mental health issues to enable him to reunify with P.E. Moreover, there is no credible dispute that the Division explored all of the relative resource placement options presented to it.  KLG was not an option because adoption was feasible and likely.  See P.P., 180 N.J. at 509-510.

Finally, the fourth prong of the best interests standard requires an assessment of whether the termination of parental rights will not do more harm than good.  See N.J.S.A. 30:4C-15.1(a)(4).  "[T]he fourth prong . . . is a 'fail-

A-4993-18T3

safe' inquiry guarding against an inappropriate or premature termination of parental rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 453 (2012). This prong is satisfied "where it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong." K.H.O., 161 N.J. at 363. "The State should offer 'testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship'" with the natural and resource parents. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 559 (2014) (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)).

The record amply supports the trial judge's findings that P.E.'s bond with her resource parents was much stronger and healthier than with D.E. The Division's unrebutted expert testimony also proved the resource parents could ameliorate the harm resultant from severance of the relationship between father and daughter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21                                                                 A-4993-18T3